IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GARDEN RIDGE CORPORATION, *et al.*, | ) | Case No. 04-10324 (KJC) |
| | ) | |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | |
| GARDEN RIDGE, L.P., | ) | Civil Action No. 06-516 (GMS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| DANIEL FERGUSON, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF JOSEPH M. BARRY IN SUPPORT OF PLAINTIFF
GARDEN RIDGE, L.P.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | ss: |
| COUNTY OF NEW CASTLE | ) | |

Joseph M. Barry, being duly sworn, deposes and says:

1.    I am an associate with the firm Young Conaway Stargatt & Taylor, LLP, counsel for the plaintiff Garden Ridge, L.P. (the "Plaintiff") in the above-captioned action.  This affidavit is submitted in support of the Plaintiff's Motion for Partial Summary Judgment filed contemporaneously herewith.

2.    Annexed hereto are true and correct copies of the following documents:

Exhibit A:    *Motion of Daniel Ferguson for Relief from the Automatic Stay Under § 362(d)(1) of the Bankruptcy Code to the Extent Necessary to Set Off Mutual Debts* filed in the Bankruptcy Court[1] by Daniel Ferguson on April 13, 2005;

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plaintiff's Opening Brief in Support of Plaintiff's Motion for Partial Summary Judgment filed contemporaneously herewith.

Exhibit B:    Memorandum and Opinion of Hon. Randolph Baxter, *In re Garden Ridge Corp.*, Ch. 11 Case No. 04-10324 (RB) (Bankr. D. Del. February 10, 2006);

Exhibit C:    Complaint, *Garden Ridge L.P. v. Daniel Ferguson (In re Garden Ridge Corporation)*, Ch. 11 Case No. 04-10324 (KJC), Adv. No. 06-50558 (KJC) (Bankr. D. Del. March 7, 2006);

Exhibit D:    Answer, *Garden Ridge L.P. v. Daniel Ferguson (In re Garden Ridge Corporation)*, Ch. 11 Case No. 04-10324 (KJC), Adv. No. 06-50558 (KJC) (Bankr. D. Del. April 6, 2006);

Exhibit E:    *Motion of Daniel Ferguson for Withdrawal of the Reference to the Bankruptcy Court and Demand for Jury Trial* filed in the Bankruptcy Court by Daniel Ferguson on June 23, 2006;

Exhibit F:    *Motion of Daniel Ferguson to Determine Core or Non-Core Status* filed in the Bankruptcy Court by Daniel Ferguson on June 23, 2006;

Exhibit G:    Note dated March 8, 2001;

Exhibit H:    Note dated January 1, 2002;

Exhibit I:    Note dated January 1, 2003;

Exhibit J:    Proof of Claim of Daniel Ferguson against Garden Ridge Corp. dated April 12, 2004 in the amount of $310,000;

Exhibit K:    Transcript of Deposition of Daniel Ferguson, *In re Garden Ridge Corporation*, Ch. 11 Case No. 04-10324 (RB) (Bankr. D. Del. October 27, 2005) (portions only).

Dated: November 17, 2006
Wilmington, Delaware

Joseph M. Barry

Sworn to before me
this 17th day of November, 2006

ANGELA M. COLSON
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Aug. 31, 2007

2

064397.1001

Exhibit A

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

</div>

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | **Chapter 11** |
| | : | |
| **GARDEN RIDGE CORPORATION** | : | **Case No. 04-10324 (DDS)** |
| **et al.,** | : | |
| | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | **Hearing: April 28, 2005, 11:30 a.m.** |
| | : | |
| | : | **Objections Due: April 21, 2005** |
| | : | |

<div align="center">

**MOTION OF DANIEL FERGUSON FOR RELIEF FROM THE AUTOMATIC STAY UNDER §362(d)(1) OF THE BANKRUPTCY CODE TO THE EXTENT NECESSARY TO SET OFF MUTUAL DEBTS**

</div>

Daniel Ferguson ("Ferguson"), a former employee of the above-captioned Debtors and a party in interest in the above captioned and jointly administered cases of Garden Ridge Corporation and its affiliates, debtors and debtors in possession ("Debtors"), hereby requests relief from the automatic stay under § 362(d) of the United States Bankruptcy Code[1] to the extent necessary to set off amounts owing from and owed to the Debtors, and in support thereof avers as follows:

<div align="center">

**JURISDICTION**

</div>

1.    The Court has jurisdiction over this core proceeding and contested matter under 28 U.S.C. § 1334, 28 U.S.C. § 157(b)(2)(G) and venue is proper under 28 U.S.C. §1408 et seq. The statutory bases for this motion are Code §§ 361, 362(d)(1) and 553(a). Rule 4001 and Local Rule 4001-1 govern this proceeding.

---

[1]    Unless otherwise specified, all references to chapter and sections refer the United States Bankruptcy Code 11 U.S.C. §§ 101-1330, as amended; all references to Rules refer to the Federal Rules Bankruptcy Procedures 1001 through 9035, as amended; and all references to Local Rules refer to the Local Bankruptcy Rules for the District of Delaware, rules 1001-1 through 9078-1, as amended.

## BACKGROUND

2.      On February 2, 2004 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under Chapter 11 of the United States Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware (the "Court"). Since the Petition Date, the

Debtors have been administering their assets and affairs as debtors in possession pursuant to

Code §§ 1107(a) and 1108.

3.      Pre-petition, on January 26, 2001, the Debtors extended an offer of employment

to Mr. Ferguson for the position of "Senior Vice President - Supply Chain", in the form of a

letter agreement ("Agreement") setting out the terms of Mr. Ferguson's employment and various

benefits to which he was to be entitled. Mr. Ferguson executed the Agreement on January 28,

2001 and thereafter served as a member of the Debtors' Executive Committee.[2]

4.      On September 12, 2003, Mr. Ferguson's employment was terminated without

cause.

5.      Pursuant to the Agreement, if his employment was terminated without cause, Mr.

Ferguson was entitled to receive "one year of base salary". The Agreement also provided that

the Debtors would cover closing costs, including customary real estate commissions up to a

maximum of 6% on the sale of Mr. Ferguson's existing home in order to facilitate his relocation

to the Houston area.

6.      As of the Petition Date, the Debtors were indebted to Mr. Ferguson in a total

amount of $310,000.00, comprising the severance benefit of "one year of base salary", and up to

$60,000 in closing costs and commission related to Mr. Ferguson's relocation to Houston.

---

[2] A copy of Mr. Ferguson's timely-filed Proof of Claim, which includes the Agreement, is attached as Exhibit A and
incorporated by reference.

7.    As of the Petition Date, Mr. Ferguson was indebted to the Debtors in the sum of $250,000, reflecting the balance of a loan ("Loan") made by the Debtors to Mr. Ferguson in connection with his relocation to the Houston area, and evidenced by a promissory note signed on January 1, 2003.

8.    Mr. Ferguson has the right under the common law and Code § 553(a) to set off any mutual pre-petition debts owed to the Debtors against the Debtors' pre-petition debts to him. The Debtors' debts to Mr. Ferguson exceed his debts to the Debtors. Therefore, Mr. Ferguson is a partially secured creditor, pursuant to Code § 506(a), holding an unsecured deficiency claim in the amount of $60,000.00.

9.    Pursuant to the First Amended Plan of Reorganization, filed on March 29, 2005 ("Plan"), the Debtors propose that this Court issue an injunction against the enforcement or assertion of various pre-petition debts following the Effective Date of the Plan, including any pre-petition set-off rights.

## RELIEF REQUESTED

10.    Although Mr. Ferguson has raised the set-off issue in his timely-filed Proof of Claim, out of an abundance of caution and in order to avoid potential prejudice to his set-off rights as a result of the Plan's injunctive provisions, Mr. Ferguson requests relief from the Automatic Stay to the extent necessary to set off his pre-petition claims against his pre-petition debt owed to the Debtors.

11.    Furthermore, to avoid the necessity for any future claim objection or adversary proceeding on account of the mutual pre-petition debts involved, Mr. Ferguson's claim should be allowed in a revised amount of $60,000, consistent with the deficiency owed to him once the parties' mutual pre-petition debts are set off.

## REQUEST FOR RELIEF

### Cause exists for granting relief from stay

12.    Section 362(a) makes the automatic stay applicable as against:

> (7)    the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor.

11 U.S.C. § 362(a)(7).

13.    Section 553(a) provides, in part:

> ...this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...

11 U.S.C. § 553(a).

14.    Section 553 of the Bankruptcy Code preserves in bankruptcy the equitable right of setoff available at common law, which permits parties that owe mutual debts to each other to state the accounts between them, subtract one from the other and pay only the balance remaining. This is a rule grounded on the absurdity of "making A pay B when B owes A." In re GEC Industries, Inc., 128 B.R. 892, 899-900 (Bankr. D.Del., 1991.) (citing Studley v. Boylston Nat'l Bank, 229 U.S. 523, 528 (1913)).

15.    Section 362(d)(1) provides, in part:

> On request of a party in interest and after notice and a hearing the court shall grant relief from the stay provided under subsection (a) of this section such as by terminating, annulling, modifying or conditioning such stay-...

> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d).

4

16.    The U.S. Supreme Court has held that a bankruptcy filing stays the exercise of setoff rights. Pursuant to Code § 362(d)(1), creditors wishing to set off existing claims against a debtor must do so by requesting the lifting of the automatic stay. See Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18-19 (1995).

17.    Cause exists here for the lifting of the automatic stay to permit setoff, because the Debtors and Mr. Ferguson have valid, enforceable mutual obligations.

18.    Mr. Ferguson is requesting relief to permit the setoff of the parties' mutual pre-petition debts in a timely fashion, and lifting of the stay to allow for set off will not cause harm or inconvenience to other parties. The set-off of the parties' mutual debts will simply reduce Mr. Ferguson's claims against the Debtors to roughly $60,000, excluding pre- or post-petition interest, and thus will in fact reduce his pro-rata share of any proposed distribution of preferred stock in the reorganized Debtors to the benefit of other creditors in the same class, who will receive proportionately greater amounts of stock as a result.

19.    Set-off is proper under Texas law, the governing law of the Agreement. Texas courts recognize the propriety of setoff: "setoff brings together the obligations of opposing parties to each other and, by judicial action of the court, makes each obligation extinguish the other", so that the "object of a setoff is to adjust the indebtedness between the parties and allow recovery of only the balance due". CPS Int'l v. Harris & Westmoreland, 784 S.W. 2d 53, 54 (Tex.Ct.App. 1990), citing Nalle v. Harrell, 12 S.W.2d 550 (Tex.Ct.App. 1929). Furthermore, the 5th Circuit Court of Appeals has recognized that "[t]he only requirements for setoff" under Texas law "are that the debts and claim be mutual and prepetition". In re Corland Corp., 967 F.2d 1069, 1077 (5th Cir. 1992).

20.     The setoff proposed would be proper under Texas law since the pre-petition debts at issue are mutual: the Debtors owe severance pay and closing commissions to Mr. Ferguson, and Mr. Ferguson received the Loan from the Debtors.

21.     As the balance of the mutual obligations between the Debtors and Mr. Ferguson favors the latter and the matter is already before the Court on this Motion, Mr. Ferguson also requests that the Court allow his $60,000 unsecured deficiency claim against the Debtors, relieving the estates of the further expense of litigating claims objections or adversary proceedings related to the same mutual debts.

WHEREFORE, Daniel Ferguson respectfully requests that the Court enter an order granting relief from the automatic stay to allow him to set off the Debtors' outstanding pre-petition debts to him under the Agreement against the balance of the Loan, allow him an unsecured deficiency claim in the amount of $60,000 for the deficiency outstanding, and grant him such other and further relief as the Court deems just and equitable.

Dated: April 13, 2005
Wilmington, Delaware

Respectfully Submitted,

BUCHANAN INGERSOLL PC

/s/     William D. Sullivan
William D. Sullivan (#2820)
1007 N. Orange St., Suite 1110
Wilmington, DE 19801
(302) 428-5500
(302) 428-3996 (fax)

Counsel for Daniel Ferguson

6

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

GARDEN RIDGE CORPORATION
et al.,

Debtors.

: Chapter 11
:
: Case No. 04-10324 (DDS)
:
: Jointly Administered
:
:
:
:

### ORDER

Upon consideration of the Motion Of Daniel Ferguson For Relief From The Automatic Stay Under §362(D)(1) Of The Bankruptcy Code To The Extent Necessary To Set Off Mutual Debts (the "Motion"); and adequate notice of the Motion having been given; and this Court being fully advised on the premises;

IT IS HEREBY ORDERED, FOUND AND DECREED:

1. The Motion is GRANTED;

2. The automatic stay provided by section 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), shall be modified as of the date of this Order, to permit movant Daniel Ferguson to set off his pre-petition debt to the above-captioned Debtors in the principal amount of $250,000 against the Debtors' pre-petition debts to him for a $250,000 severance payment and a $60,000 real estate commission.

3. Ferguson's pre-petition debt to the Debtors having been completely set off by the Debtors' pre-petition debts to him, Ferguson's claim against these Debtors is allowed as a general unsecured claim for the deficiency in the amount of $60,000.

4.    Except as expressly provided in this Order, the provisions of section 362(a) of the

Bankruptcy Code shall remain in full force and effect and shall not be deemed

modified or waived in any manner, including, without limitation, the automatic

stay, the pursuit of any claims against the Debtors, or the enforcement of or

execution against the Debtors upon any judgment.

Dated: April _____, 2005                    _____

                                            Hon. Donal D. Sullivan
                                            United States Bankruptcy Judge

Exhibit B

LEXSEE 338 BR 627

**In Re: GARDEN RIDGE CORPORATION, et al., Debtors.**

**In Proceedings Under Chapter 11, Case No.: 04-10324**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE**

*338 B.R. 627; 2006 Bankr. LEXIS 373*

**February 10, 2006, Decided**

**COUNSEL:** [**1]  For Garden Ridge Corporation, Debtor: Erin Edwards, Joseph M. Barry, Pauline K. Morgan, Sean T. Greecher, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Russell Mentlewski, Petitioning Creditor: Barbara H. Stratton, Knepper & Stratton, Wilmington, DE.

For United States Trustee, U.S. Trustee: David Michael Klauder, US Trustee's Office, Wilmington, DE.

For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Creditor Committee: David M. Fournier, David B. Stratton, Evelyn J. Meltzer, James C. Carignan, Pepper Hamilton LLP, Wilmington, DE.

For Concord MillsMall Limited Partnership, Creditor Committee: Christina Maycen Thompson, Connolly Bove Lodge & Hutz LLP, Wilmington, DE.

**JUDGES:** Randolph Baxter, UNITED STATES BANKRUPTCY JUDGE.

**OPINION BY:** Randolph Baxter

**OPINION:**

[*630]  **MEMORANDUM OF OPINION AND ORDER**

JUDGE RANDOLPH BAXTER

Before the Court is the motion of Daniel Ferguson ("Ferguson") for relief from the automatic stay under *§ 362(d) of the United States Bankruptcy Code* to the extent necessary to set off certain amounts owing from and owed to the Debtors. n1

n1 Garden Ridge, L.P., Garden Ridge Corporation, Garden Ridge Management, Inc., Garden Ridge Finance Corporation, Garden Ridge Investments, Inc., and Garden Holdings, Inc. (collectively, the "Debtors" or the "Reorganized Debtors").

[**2]

The Court acquires core matter jurisdiction over this matter pursuant to *28 U.S.C. § 157(a), (b)* and *1334(b)*. Upon an examination of the parties' respective briefs and supporting documentation, and after conducting a hearing on the matter, the following findings of fact and conclusions of law are hereby rendered:

Garden Ridge Corporation and its jointly administered affiliate co-debtors (the "Debtors") operate home decor retailers with 35 stores in 13 states throughout the South, Midwest, and Mid-Atlantic regions of the United States. Garden Ridge Management, Inc. ("GRM") is a management services company that employs all of the staff and management utilized at the Garden Ridge stores. Garden Ridge, L.P. ("GRLP"), the entity that operates all of the Garden Ridge stores, pays GRM a fee for the use of GRM's employees in its stores. GRM holds a one percent (1%) general partnership interest in GRLP, with the remaining 99% being held by Garden Ridge Investments, Inc.

[*631]  On January 28, 2001, Ferguson executed an employment agreement (the "Employment Agreement") whereby he was to become a member of Garden Ridge's Executive Committee as the Senior Vice President -- Supply Chain. [**3]  n2 The Employment Agreement provided that in the event that he was released without cause, Ferguson would receive one year of base salary. The Agreement also provided for the payment of certain relocation costs (including customary real estate commissions up to 6% maximum on the sale of Ferguson's

Case 1:06-cv-00516-GMS    Document 10    Filed 11/17/2006    Page 16 of 117

Page 2

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

existing house) in conjunction with Ferguson's move to Houston.

n2 Exhibit A to Debtors' Objection.

On January 31, 2003, due to a delay in the sale of his house in Michigan, Ferguson executed a promissory note in favor of GRLP in the principal amount of $ 250,000 (the "Note"). n3 The Note became due and payable upon the earlier of (i) thirty (30) days after the closing of the sale of Ferguson's real property in Michigan, (ii) the date of Ferguson's termination of employment (with or without cause), and (iii) December 31, 2003. Since Ferguson's house remained unsold, the Note was renewed annually. At this time, it is undisputed that the full face amount of the Note remains due.

n3 Exhibit C to Debtors' Objection.

[**4]

Ferguson was terminated on September 12, 2003. The parties disagree on whether Ferguson's termination was for cause. Ferguson has initiated a $ 310,000 cause of action against GRM and GRLP in state court in Texas (the "State Court Action") seeking payment of $ 250,000 in severance pay (comprising one year of base salary), and $ 60,000 in unpaid relocation costs. n4

n4 Exhibit D to Debtors' Objection.

On February 2, 2004, the Debtors filed for protection under chapter 11 of the Bankruptcy Code. The schedules filed by GRM (the "GRM Schedules") n5 included an unliquidated claim of Ferguson related to the State Court Action. No accounts receivable from Ferguson were listed on the GRM Schedules. Because GRLP was a named defendant in the State Court Action, the schedules filed by GRLP (the "GRLP Schedules") n6 also included an unliquidated claim of Ferguson. The GRLP Schedules listed the Note payable from Ferguson.

n5 Exhibit E to Debtors' Objection.

[**5]

n6 Exhibit F to Debtors' Objection.

On April 16, 2004, Ferguson filed an unsecured, non-priority claim in the amount of $ 310,000 (the "Claim"). n7

n7 Exhibit G to Debtors' Objection.

The consolidated chapter 11 plan of GRM and GRLP (the "Plan"), along with the other Garden Ridge entities, was confirmed on March 29, 2005. n8

n8 Exhibit 10 to Debtors' Post Hearing Memorandum.

Ferguson asserts that the amount of $ 250,000 owed by Ferguson to GRLP on the Note should be setoff by the amount of $ 310,000 owed by the Debtors to Ferguson for severance fees and various unpaid relocation costs. Ferguson argues that the net result would place him in the position of an unsecured creditor for the $ 60,000 deficiency outstanding.

"A creditor who has the right [**6] to setoff may obtain relief from the automatic [*632] stay in order to implement the setoff." *In re Dye, 2004 Bankr. LEXIS 2320, 2004 WL 2249503, *7 (Bankr. M.D. N.C. 2004)*; *In re Stienes, 285 B.R. 360, 362 (Bankr. D. N.J. 2002)* ("In order to exercise a valid right of setoff, a creditor must move for relief from the automatic stay under *11 U.S.C. § 362(d)*."). "The right of setoff (also called offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A.' Although no federal right of setoff is created by the Bankruptcy Code, *11 U.S.C. § 553(a)* provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18, 116 S. Ct. 286, 133 L. Ed. 2d 258 (1995)*. Section 553(a) provides, in relevant part, that:

> this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement [**7] of the case . . .

*11 U.S.C. § 553(a)*. "The burden of proof is on the party asserting the right to set-off." *E.g., In re Lason, Inc., 314*

Case 1:06-cv-00516-GMS    Document 10    Filed 11/17/2006    Page 17 of 117

Page 3

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

*B.R. 296, 305 (Bankr. D. Del. 2005); In re Bennett Funding Group, Inc., 212 B.R. 206, 212 (B.A.P. 2nd Cir. 1997).* Whether to allow setoff is a determination within the sound discretion of this Court. *E.g., In re Continental Airlines, 218 B.R. 324, 328 (D. Del. 1997) (citing United States on behalf of IRS v. Norton, 717 F.2d 767, 772 (3d Cir. 1983)); HAL, Inc. v. United States (In re HAL, Inc.), 196 B.R. 159, 161 (B.A.P. 9th Cir. 1996)* ("Whether or not to allow setoff pursuant to § 553 is left to the sound discretion of the bankruptcy court."); *In re Bangert, 226 B.R. 892, 903 (Bankr. D. Mont. 1998).*

To enforce a setoff right, "[a creditor must establish that (1) it has a right of setoff under nonbankruptcy law; and (2) this right should be preserved in bankruptcy under § 553." *In re HAL, Inc., 196 B.R. at 161; In re Atanasov, 221 B.R. 113, 117 (D.N.J. 1998)* ("Courts may look to state law in order [**8] to determine whether a setoff has occurred, however, the granting or denial of the right to a setoff depends upon the terms of *section 553*, and not upon the terms of state statutes or laws."); *In re Tarbuck, 318 B.R. 78, 81 (Bankr. W.D. Pa. 2004)* ("The threshold question in every case involving an asserted right of setoff is the source and validity of the underlying right.").

To determine which state's law to apply, the Court turns to Delaware choice of law rules. *E.g., In re PHP Healthcare Corp., 128 Fed. Appx. 839, 843 (3d Cir. 2005); In re Eagle Enterprises, Inc., 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998) (citing Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941))* ("In most instances bankruptcy courts rely on the rule observed by federal district courts hearing diversity cases and use the choice of law rules of the forum state."). The Note includes a choice of law provision stating that it is governed by Texas law. Ferguson's action is a breach of contract claim brought in Texas state court, and arising from an employment agreement executed and performed in Texas. Therefore, the Court turns [**9] to Texas law to determine whether Ferguson has a right to setoff. *See Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc., 350 F. Supp. 2d 582, 595 (D. Del. 2004)* ("Under Delaware [choice of law rules], express choice of law provisions in contracts are generally given effect."); *Matter of Deemer Steel Casting Co., Inc., 117 B.R. 103, 107 (Bankr. D. Del. 1990)* ("In cases sounding [*633] in contract, Delaware's conflicts of law rules require application of the law of the state with the most significant contacts."). Therefore, it is clear, and undisputed by the parties, that Texas laws of setoff applies.

Under Texas law:

Setoff is a form of equitable counterclaim which brings together obligations of parties opposing each other and, by judicial action, makes each obligation extinguish the other. The object of equitable setoff is to adjust the demands between the parties and allow a recovery of only the balance that is due. In order for one demand to be set off against another, both demands must mutually exist between the same parties. Indeed, setoff is proper only where demands are mutual, between the same parties, and in the same capacity or [**10] right.

*Capital Concepts Properties 85-1 v. Mutual First, Inc., 35 F.3d 170, 175 (5th Cir. 1994) (citations omitted).* Similarly, "*section 553(a)* recognizes and preserves rights of setoff where four conditions exist: (1) The creditor holds a claim' against the debtor that arose before the commencement of the case; (2) The creditor owes a debt' to the debtor that also arose before the commencement of the case; (3) The claim and debt are mutual'; and (4) The claim and debt are each valid and enforceable." *See, e.g., 3 Collier on Bankruptcy P 553.01 [1]; In re Czyzk, 297 B.R. 406, 409 (Bankr. D. N.J. 2003); Pardo v. Pacificare of Tex., Inc. (In re APF Co.), 264 B.R. 344, 354 (Bankr. D. Del. 2001).*

The effect of setoff is to elevate "an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor." *Lee v. Schweiker, 739 F.2d 870, 875 (3d Cir. 1984); In re Health Management Ltd. Partnership, 332 B.R. 360, 363-64 (Bankr. C.D. Ill. 2005).*

The first two elements of setoff are uncontested in this case. Both debts arose pre-petition. The parties [**11] have also agreed to separately brief and argue the validity and enforceability of the Ferguson claim at a separate time. n9 Therefore, the issue to be determined by the Court at this time is whether Ferguson has met his burden of showing by a preponderance of the evidence, that the Note to GRLP and the state court action against GRLP and GRM are "mutual" for the purposes of Texas law and § 553.

n9 Debtors' Objection, at 8 n.3.

"To establish its right to setoff under *Section 553 of the Bankruptcy Code*, the creditor must show mutuality of obligation. *BEA Sys. v. Shubert (In re Winstar Communs.), 315 B.R. 660, 662-63 (D. Del. 2004).* "Mutuality of obligations is determined by state law." *In re Czyzk,*

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

*297 B.R. at 409.* Under Texas and federal law, "mutuality of obligation exists when debts are owing between the same parties in the same right or capacity." *E.g., Mullen v. Cheatham, 1999 Tex. App. LEXIS 9109, 1999 WL 1095917, *3 (Tex. App. 1999); Brook Mays Organ Co., Inc. v. Sondock, 551 S.W.2d 160, 166 (Tex. Civ. App. 1977);* [**12] *In re Wilson, 69 B.R. 960, 965 (Bankr. N.D. Tex. 1987); see also In re Winstar Communs., 315 B.R. at 662-63; Buchanan v. Kerr-McGee Energy Servs. (In re GPR Holdings, L.L.C.) 2004 Bankr. LEXIS 1286, 2004 WL 3007080, *4 (Bankr. N.D. Tex. 2004).* "For mutuality to exist, each party must own his claim in his own right severally, with the [*634] right to collect in his own name against the debtor in his own right and severally." *Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030, 1036 (5th Cir. 1987); In re Taylor Motors, 60 B.R. 760, 763 (Bankr. D. Nev. 1986)* ("Mutuality of the debt and claim means that the creditor is indebted to the debtor who likewise owes a debt to the creditor . . . ."). For setoff purposes, the mutuality requirement is strictly construed. *E.g., In re Bennett Funding Group, Inc., 212 B.R. at 212; In re Clemens, 261 B.R. 602, 606 (Bankr. M.D. Pa. 2001).*

A triangular setoff occurs where "A attempts to offset an obligation owed by B against B's debt to C. Setoffs of this kind are not permitted under *section 553.*" *In re KZK Livestock, Inc., 221 B.R. 471, 480 (Bankr. C.D. Ill. 1998); In re HAL, Inc., 196 B.R. at 163* [**13] ("The general rule, however, holds that triangular setoffs among related parties do not meet the mutuality requirement."); *U.S. Aeroteam, Inc. v. Delphi Automotive Systems, LLC (In re United States Aeroteam), 327 B.R. 852, 864, 327 B.R. 852, 2005 Bankr. LEXIS 1900, (Bankr. S.D. Ohio 2005)* ("Consequently, a triangular setoff,' . . . is prohibited because there is no mutuality of debt between two parties.").

Two exceptions have been recognized to the principle that triangular setoffs lack the requisite mutuality for setoff. First, courts have held that setoffs involving separate governmental agencies may satisfy the mutuality requirement under § *553. E.g., In re HAL, Inc., 196 B.R. at 163; In re U.S. Aeroteam, Inc., 327 B.R. at 864 n.9, 2005 Bankr. LEXIS 1900 (citing United States v. Butler, 92 F.3d 960, 1996 WL 33403850 (Bankr. S.D. Ga. 1996))* ("This case does not require the court to address triangular setoffs involving separate government agencies. Under certain circumstances, these types of triangular setoffs have been allowed."); *In re Nuclear Imaging Systems, Inc., 260 B.R.at 733-34 (citing Cherry Cotton Mills v. United States, 327 U.S. 536, 66 S. Ct. 729, 90 L. Ed. 835, 105 Ct. Cl. 824, 1946-1 C.B. 228 (1946))* ("The vast majority of courts have concluded, within the [**14] confines of a bankruptcy case, that all agencies of the United States constitute a single unitary creditor' for pur-

poses of setoff under *section 553.*"). The second exception is that an express agreement between the related entities may created mutuality for setoff purposes. *E.g., In re U.S. Aeroteam, Inc., 327 B.R. at 865, 2005 Bankr. LEXIS 1900* ("Generally, courts are in agreement that an assignment of rights can create mutuality for setoff purposes.").

Ferguson argues that mutuality exists in this case, since 1) Ferguson alleges that he was employed by Garden Ridge, collectively, and not solely by the Debtors; 2) that GRM and GRLP were, for practical purposes, a single entity, and 3) the several entities of Garden Ridge were consolidated into a single entity, the Reorganized Debtor, through the Plan. Finally, Ferguson argues that even if a triangular set-off existed, these circumstances fall within a recognized exception permitting setoff, since the parties intended that the obligations of the Note to GRLP would compensate GRM for making the Loan.

The Debtors, however, argue that the debts are not mutual, asserting this situation presents an impermissible "triangular [**15] setoff," since Ferguson was employed by GRM, and the note was payable to GRLP. Alternatively, the Debtors argue that Ferguson, as a fiduciary of the Debtors, cannot effectuate a setoff.

## A. Mutuality

### 1. Identity of Ferguson's Employer

The parties dispute whether GRM was Ferguson's employer, or whether Ferguson [*635] was employed collectively by the various entities of Garden Ridge, including GRLP.

The Debtors argue that the requisite mutuality does not exist, since Ferguson was employed by GRM, and the note was payable to GRLP. The Debtors rely primarily on Ferguson's paychecks and W-2 Form, which clearly state that "Garden Ridge Management, Inc." was Ferguson's employer. The parties do not dispute that GRM and GRLP were, at all times prior to filing, distinct legal entities.

Ferguson argues that despite the fact that GRM appeared on the paychecks and W-2 Form, GRM's payroll account was entirely funded and controlled by GRLP. Ferguson also notes that GRLP was the entity responsible for severance obligations of the Debtors. Ferguson notes that the Employment Agreement refers only to "Garden Ridge," and makes no mention of GRM, or any specific entity of the Debtors. Ferguson [**16] offers his own testimony that he was unaware of the specific entity that was his true employer. Finally, contemporaneously with the Note, Ferguson received a letter which states:

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

Contemporaneously with the execution of this letter, you are executing the Note, and Garden Ridge, L.P. (the "Company") is making the loan to you evidenced by the Note. You currently are serving as an employee of the Company. . . .

    Sincerely,

    GARDEN RIDGE, L.P.,

By: Garden Ridge Management, Inc.,

General Partner n10

    n10 Exhibit 2 to Ferguson's Post-Hearing Brief.

Ferguson's arguments on this point are misguided. Ferguson's subjective belief, however well founded, does not overcome the legal conclusion that the debts are not mutual. For independent reasons, Garden Ridge created and maintained GRM and GRLP as distinct legal entities. According to his paychecks and his W-2 tax form, Ferguson was paid, and was formally employed, by GRM. The assertion that GRLP controlled the payroll account does not change this legal status. [**17] Ferguson cannot create the required mutuality by naming GRLP as a defendant in the State Court Action, despite the fact that his cause of action arose from his employment by GRM.

It is settled law that a triangular setoff exists even where the parties are related subsidiaries. *E.g.*, *In re HAL, Inc., 196 B.R. at 163* ("Thus, in the corporate context, it is well-established that one subsidiary may not set off a debt owed to a bankrupt against a debt owing to another subsidiary.'"); *Depositors Trust Co. v. Frati Enterprises, 590 F.2d 377, 379 (1st Cir. 1979)* ("It is well established that one subsidiary may not setoff a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary."); *Inland Steel Co. v. Berger, 327 F.2d 401 (7th Cir. 1964)* ("This argument appears to be supported by those cases which hold that a parent corporation may not set-off a debt owed its subsidiary by an entity against a debt it owes to the same entity."); *In re Sentinel Products Corp., 192 B.R. 41, 46 (N.D. N.Y. 1996)* (citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc., 882 F.2d 615, 618 n.2 (2d Cir. 1989)*; [**18] *In the Matter of Elcona Homes Corp., 863 F.2d 483, 486-87 (7th Cir. 1988)*; *Depositor's Trust Co. of Augusta v. Frati Enters., 590 F.2d at 379*) ("a subsidiary's debt may not be setoff against [*636] the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances."); *In re KZK Livestock, Inc., 221 B.R. at 480*

("Thus, two entities, even if related, may not aggregate their debts and claims for setoff purposes. For example, a subsidiary may not offset a debt to the debtor against a debt the debtor owes to another related subsidiary. . . ."); *In re Baja Boats 1997 Bankr. LEXIS 2125, 1997 WL 811694, *7 (Bankr. N.D. Ohio 1997)* ("The primary requirement of mutuality is that the relevant claim and debt must exist between the same parties. Therefore, two entities, even if related, may not aggregate their debts and claims for setoff purposes."); *In re Hill Petroleum Co., 95 B.R. 404, 411-12 (Bankr. W.D. La. 1988)* (citing 4 COLLIER ON BANKRUPTCY § 553.04 at 553-19 (1988)); *Matter of Fasano/Harriss Pie Co., 43 B.R. 864, 870 (Bankr. W.D. Mich. 1984)* (citations omitted) ("The [**19] same rule applies with a parent corporation and a wholly owned subsidiary. Since an intercorporate relationship is insufficient to meet the mutuality requirement in an offensive claim of setoff by a member at the corporate family against a third party, it likewise is insufficient to meet the mutuality requirement in a third party claim of setoff against a member of the corporate family."); *In re Virginia Block Co., 16 B.R. 560, 562 (Bankr. W.D. Va. 1981)* ("Furthermore, a corporation may not setoff the right of an associated, wholly owned corporation, even though local custom permits such a setoff.").

This principle has also been applied in situations involving partners in partnerships. *See Capital Concepts Properties 85-1 v. Mutual First, Inc., 35 F.3d 170, 175 (5th Cir. 1994)* (finding that the "premise that the debt owed to a partnership creditor [] may be set off against the claim of an individual partner [] against the partnership creditor does not find any clear support in the decided cases."); *In re Nuclear Imaging Systems, Inc., 260 B.R. 724, 733 (Bankr. E.D. Pa. 2000)* (citing *Gray v. Rollo, 85 U.S. [18 Wall.] 629, 21 L. Ed. 927 (1873)*) [**20] (mutuality for purposes of setoff is absent when a partnership has a claim against an individual but the individual has a claim against a partner of the partnership); *In re Ingersoll, 90 B.R. 168, 171 (Bankr. W.D. N.C. 1987)* ("This is consistent with other authorities which have found no mutuality in situations involving parent corporations and subsidiaries, sister corporations, and partnerships and individual partners."); *In re Virginia Block Co., 16 B.R. at 562* ("Strict construction of the element of mutuality means that a debt due an individual partner cannot be setoff against a claim of the partnership.").

This case does not present a permissible triangular setoff based upon an agreement between the related entities. Although Ferguson argues that the note to GRLP was intended to directly, or indirectly, benefit GRM, he has not alleged that any formal or express agreement between GRM and GRLP existed. *Depositors Trust Co. of Augusta v. Frati Enterprises, Inc., 590 F.2d at 379*

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

("Thus, although Bangor and Augusta are basically the same bank, we cannot treat them as such, in the absence of an agreement by the bankrupt to treat [**21] the two banks as one."); *In re Hill Petroleum Co., 95 B.R. at 412* ("The narrow exception to the rule against three party, 'triangular' setoffs, occurs where there is a formal agreement by the debtor that two entities may aggregate debts owed to and from the debtor."); *In re Lang Machinery Corp., 1988 Bankr. LEXIS 1667, 1988 WL 110429, *5 (Bankr. W.D. Pa. 1988)*; *In re Balducci Oil Co., Inc., 33 B.R. 847, 853 (Bankr. D. Colo. 1983)* (citations omitted) ("The courts have found mutuality between three parties, as a matter [*637] of contract law, where there was an express contractual agreement clearly evincing the intent of the parties to treat the parent and subsidiary as one entity.").

Therefore, the formal legal relationship between the parties herein presents an impermissible triangular setoff, as the required mutuality of the parties does not exist. To the extent that Ferguson argues that the entities operated as a single entity, and therefore should be considered to be as the same entity for setoff purposes, such arguments are addressed below.

## 2. Whether GRM and GRLP Should Be Treated as One Entity

Ferguson argues that Garden Ridge, as a collective unit, operated in a [**22] manner such that the Debt and the Ferguson Claim involve the same entity. Therefore, Ferguson argues that the Court should disregard the fact that GRM and GRLP were separate legal entities. Texas law provides that in several broad instances, the corporate entity may be disregarded, including "1) when the corporation is the alter ego of its owners or shareholders; 2) when the corporation is used for illegal purposes; and 3) when the corporation is used as a sham to perpetrate a fraud." *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc., 30 F.3d 627, 629-30 (5th Cir.1994)* (citing *Villar v. Crowley Maritime Corp., 990 F.2d 1489, 1496 (5th Cir.1993)).*

Among the reasons recognized in the past for disregarding the corporate fiction are: (1) when it is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where it is used to evade an existing legal obligation; (4) where it is employed to achieve or perpetrate a monopoly; (5) where it is used to circumvent a statute; and (6) where the corporate fiction is re-

lied upon as a protection [**23] of crime or to justify wrong.

*Carlson Mfg. v. Smith, 179 S.W.3d 688, 2005 WL 2878033, *3 (Tex. App. 2005)*; *Castleberry v. Branscum, 721 S.W.2d 270, 271, 29 Tex. Sup. Ct. J. 481 (Tex.1986)*.

The purpose of disregarding the corporate entity in these instances is to prevent fraud, illegality, or to avoid an otherwise inequitable result. *See, e.g., Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc., 30 F.3d at 630* ("The purpose of disregarding the corporate fiction is to prevent the corporation's owners from using the corporate entity as a cloak for fraud or illegality."); *Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, 2005 WL 2878033, *3* ("However, the purpose of the single business enterprise theory, like the alter ego theory and other doctrines designed to pierce the corporate veil, is to prevent an inequitable result."); *SSP Partners v. Gladstrong Invs. (USA) Corp., 169 S.W.3d 27, 2005 WL 1693765, *1 (Tex. App. 2005)* ("Texas recognizes the single business enterprise doctrine' to prevent an entity from relying upon corporate form to evade an existing debt or legal obligation."); *Goldstein v. Mortenson, 113 S.W.3d 769, 780 (Tex. App. 2003)* [**24] ("We disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result."). Therefore, the corporate entity will not be disregarded unless there are compelling reasons to do so. *See, e.g., Barrera v. Roscoe, Snyder & Pac. Ry. Co., 385 F.Supp. 455, 461 (N.D. Tex. 1973)* (quoting [*638] *Ruberoid Co. v. North Tex. Concrete Co., 193 F.2d 121, 122 (5th Cir. 1952))* ("The doctrine of separate entity fills a useful purpose in business life and the courts are hesitant to disregard it unless the facts presented demonstrate some misuse of the corporate privilege or the need of limiting it in order to do justice."); *Cementos de Chihuahua, S.A. de C.V. v. Intermodal Sales Corp., 162 S.W.3d 581, 585-86 (Tex. App. 2005)* (quoting *Lucas v. Texas Industries, Inc., 696 S.W.2d 372, 374, 27 Tex. Sup. Ct. J. 491 (Tex.1984))* ("disregard of the legal fiction of corporate entity' is an exception to the general rule which forbids disregarding corporate existence."); *Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, 2005 WL 2878033, *3* [**25] ("Because Texas law presumes that two separate corporations are distinct entities, the courts will not disregard the separate legal identities of corporations unless that relationship is used to defeat public convenience, to justify wrongs such as violation of the anti-trust laws, to protect fraud, or to defend crime."); *Tigrett v. Pointer, 580 S.W.2d 375, 392 (Tex. Civ. App. 1978)* ("The general rule prohibits disregard of the corporate entity by a court unless that corpo-

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

rate entity is used as a means of committing fraud or to justify wrong in the sense of a violation of law or of public policy."); *King v. Tubb, 551 S.W.2d 436, 445 (Tex. Civ. App. 1977)* ("As a general rule, the corporate entity will not be disregarded unless there are compelling reasons to disregard."). Texas courts have been particularly hesitant to disregard the corporate entity in cases involving contracts. *Mancorp, Inc. v. Culpepper, 836 S.W.2d 844, 847-48 (Tex. App. 1992)* ("The overriding public policy necessary to disregard the corporate entity must be more stringent in contract cases than in tort cases because in contract cases the plaintiff has an opportunity [**26] to select the entity with which he deals as opposed to tort cases in which no such choice exists . . . . In such a situation, a court should not resort to the drastic exception to the general rule that the corporate entity must remain inviolate.").

Texas law places the burden of showing that the Court should disregard the corporate fiction on the party seeking to treat the entities as a single unit. *E.g., PHC-Minden, L.P. v. Kimberly-Clark Corp., 2005 Tex. App. LEXIS 6569, 2005 WL 1979102, *4 (Tex. App. 2005)* ("The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation."); *Wortham v. Dow Chem. Co., 179 S.W.3d 189, 2005 WL 2786996, *4 (Tex. App. 2005)*; *Mancorp, Inc. v. Culpepper, 836 S.W.2d at 847* (The "burden of proof is on the plaintiff to prove harm in order to pierce the corporate veil.").

Ferguson presents persuasive evidence to show that the Debtors' operations overlapped substantially. This Court found that such evidence was sufficient to show that the Debtors' cases should be substantively consolidated, stating:

> In the Martin Declaration, Martin attested to the following [**27] facts, which were not controverted at the Confirmation Hearing: (a) the Debtors share common management, (b) the Debtors prepare and disseminate consolidated financial reports, (c) the Debtors file consolidated federal tax returns, (d) the Debtors utilize a centralized cash management system, and (e) each of the Debtors, other than Garden Holdings, Inc., was a co-obligor under the Debtors' pre-petition working capital facility and the DIP Credit Facility. Based on the Martin Declaration, the Court finds that there is a substantial identity and inseparable [*639] relationship between the Debtors and that the benefits

of consolidation outweigh any harm or prejudice to creditors." n11

> n11 Exhibit 17 to Ferguson's Post-Hearing Brief.

The Debtors do not argue that such evidence undisputedly establishes that there was substantial identity and inseparable relationship between GRM and GRLP. In order for the Court to disregard the separately maintained corporate entities, however, Ferguson must still show that the [**28] Debtors misused the corporate privilege, or that it would be necessary to avoid an inequitable result.

> There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's actions. Merely showing a blending of activities between the parent and subsidiary, such that they may have had some or all of the same directors or officers, filed consolidated income tax returns, shared the same corporate logo, conducted inter-corporate business, or officed in the same building, is not alone sufficient to make the parent liable.

> . . . This was not sufficient to show that the parent/subsidiary relationship had been used as part of a basically unfair device to achieve an inequitable result, or that the subsidiaries were organized and operated as mere tools or business conduits of the parent.

*Trailways, Inc. v. Clark, 794 S.W.2d 479, 489-90 (Tex. App. 1990)*; *Mortgage and Trust, Inc. v. Bonner & Co., Inc., 572 S.W.2d 344, 348-49 (Tex. Civ. App. 1978)* ("As a general rule, two or more corporations are separate and [**29] distinct legal entities, and the separate identity of each will not be disregarded in order to impose liability on one corporation for the acts of another corporation merely because of: a) overlapping stock ownership; b) a duplication of some or all of the directors or officers; or c) an exercise of the control that stock ownership gives to stockholders.").

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

To the extent that Ferguson argues that GRM is the "alter ego" of GRLP, Ferguson has not alleged that the Debtors maintained GRM and GRLP as separate entities for fraudulent purposes. Under Texas law, the alter ego doctrine requires a showing of fraud. *North American Van Lines, Inc. v. Emmons, 50 S.W.3d 103, 119 (Tex. App. 2001)* ("The alter ego' theory generally involves proof of fraud, i.e., proof that the corporation is organized and operated as merely a tool or business conduit of another corporation. At a minimum, the plaintiff must prove that he has fallen victim to a basically unfair device by which [the subsidiary] has been used to achieve an inequitable result.'"); *see also In re Carrousel Motels, Inc., 160 B.R. 993, 1002 (Bankr. S.D. Ohio 1993)* ("The alter ego doctrine by its nature [**30] does not admit of mutuality; the doctrine may not be used as a shield. That is, one may not disregard corporateness unless there has been misuse of corporateness."); *In re Bellanca Aircraft Corp., 56 B.R. 339, 398-99 (Bankr. D. Minn. 1985)* ("Thus, as a matter of corporate law, without alleging fraud or some other wrong, Petco will not be allowed to disregard Pinion's corporateness to establish mutuality of obligation.").

Alternatively, Ferguson argues that GRM and GRLP were operated as a single entity, and therefore should be [*640] treated as such for setoff purposes. "Texas recognizes the single business enterprise doctrine' to prevent an entity from relying upon corporate form to evade an existing debt or legal obligation." *SSP Partners v. Gladstrong Investments (USA) Corp., 169 S.W.3d at 43.*

> Factors to be considered in determining whether separate corporations should be treated as one enterprise include: (1) common employees; (2) common offices; (3) centralized accounting; (4) payment of wages by one corporation to another corporation's employees; (5) common business name; (6) services rendered by the employees of one corporation on behalf of [**31] another corporation; (7) undocumented transfers of funds between corporations; and (8) unclear allocation of profits and losses between corporations. . . .

*Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, [WL] at cc*3.*

Although Ferguson offers evidence of the close relationship between GRM and GRLP which may warrant application of these doctrines in other contexts, he has not shown that the corporate entity should be disregarded for setoff purposes. The single business enterprise theory, and other analogous doctrines, have been enforced by Texas courts to find that a master servant relationship existed for the purposes of imposing liability, or for purposes of determining jurisdiction and other procedural matters. *See Id. Carlson Mfg., Inc. v. Smith, 179 S.W.3d 688, [WL] at *3; Newspapers, Inc. v. Love, 380 S.W. 2d 582, 590, 7 Tex. Sup. Ct. J. 274 (Tex. 1964).* There is no apparent use of the doctrine to create mutuality for setoff purposes, and such a use does not fall within the recognized categories in which Texas courts have determined that the corporate entity should be disregarded. Such a use would be inappropriate in this case, since denying setoff would not [**32] allow either party to evade an existing legal obligation or alter the legal rights of the parties, nor does Ferguson allege that the Debtors have created separate legal entity for fraudulent or wrongful purposes. *See In re Vehm Engineering Corp., 521 F.2d 186, 190-91 (9th Cir. 1975)* ("The Referee specifically found that although AIF and TWF were controlled and dominated by the same person, the two corporations were at all relevant times separate legal entities.' Hence, the debts are not mutual' and may not be offset against each other."); *In re Fairfield Plantation, Inc., 147 B.R. 946, 954-55 (Bankr. E.D. Ark. 1992)* ("In light of the absence of evidence that FAC was formed to defeat justice, perpetrate fraud, or to evade contractual or tort responsibility this Court, applying Georgia law, finds that FAC has a separate corporate identity from that of FPI. Accordingly, the party against which PEGI has a claim (FPI) is different from the party to which PEGI owes a debt (FAC) and mutuality does not exist."). In this case, Ferguson could maintain his state court action, and his legal rights would not be otherwise affected.

Therefore, Ferguson has not [**33] provided a persuasive basis to show that the Court should ignore the fact that GRM and GRLP are distinct legal entities.

### 3. Substantive Consolidation to Create Mutuality

Ferguson argues that the substantive consolidation of the Debtors created the necessary mutuality. The Plan states,

> Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other [*641] legal or equitable defense that the Debtors had immediately prior to the Petition Date that is not specifically waived or relinquished by this Plan. n12

n12 Plan, at 36.

Case 1:06-cv-00516-GMS     Document 10     Filed 11/17/2006     Page 23 of 117

Page 9

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

The Plan also states that

> On the Confirmation Date, the Chapter 11 Cases of all of the Debtors shall be substantively consolidated for all purposes related to the Plan, including, without limitation, for purposes of voting, confirmation, and distributions. . . .
>
> Such substantive consolidation shall not (other than for purposes related to the Plan) affect (i) the legal and [**34] corporate structure of the Reorganized Debtors. . . . n13

n13 Plan, at 25-26.

The language of the Plan states that the Debtors retained all defenses that they held prior to the Petition date. Ferguson does not suggest that the GRM and GRLP entities were consolidated prior to the time of the subject transactions. There is no language in the Plan which would suggest that substantive consolidation should be given retroactive effect. "The substantive consolidation of several estates means one thing and one thing only-that all assets of the several entities are pooled and all creditors of the several entities are entitled to share in the pooled assets in accord with their respective rights. It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation." *In re Murray Industries, Inc., 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991); Nickless v. Avnet, Inc. (In re Century Elecs. Mfg.), 310 B.R. 485, 493 (Bankr. D. Mass. 2004)* [**35] ("Moreover the Defendant's argument that the confirmation order provides for retroactive substantive consolidation is incorrect. The language is forward-looking. It was intended for ease of administration, not as an opportunity for the Defendant to enlarge its new value defense after the fact. It would be unfair to burden the consolidated estate with a *nunc pro tunc* application that was not contemplated when the Confirmation Order entered."). As stated in the Plan, substantive consolidation was for certain prospective purposes related to the Plan. One of those purposes was not to create mutuality so that Ferguson could enjoy the benefits of setoff.

## B. Ferguson as a Fiduciary

Finally, the Debtors argue that since Ferguson was an executive of Garden Ridge, he was subject to certain fiduciary duties, and is therefore barred from seeking to effectuate a setoff. Although it is not necessary, as Ferguson has failed to meet the mutuality requirement of setoff, this argument of the Debtors is not applicable in this instance. "Where a debt arises from a fiduciary duty or is in the nature of a trust, courts have held that there is no mutuality for setoff purposes. . . . In other [**36] words, setoff will not be permitted where granting it would have the effect of excusing or evading the [fiduciary] obligation." *Biggs v. Stovin (In re Luz Int'l), 219 B.R. 837, 848 (B.A.P. 9th Cir. 1998)* (citations omitted); *Levine v. Telco Sys. (In re World Access, Inc.), 324 B.R. 662, 685 (Bankr. N.D. Ill. 2005)* (citing *Libby v. Hopkins, 104 U.S. 303, 26 L. Ed. 769 (1881))* ("Where the liability of one claiming a set-off right arises from a fiduciary duty or is in the nature of a trust, the requisite mutuality of debts and claims does not exist, [*642] and such persons may not set-off a debt owing from the debtor against such liability."); *Dollar Bank, FSB v. Tarbuck (In re Tarbuck), 304 B.R. 718 at 721* ("For mutuality to exist, the debts must exist between the same parties in the same capacity, i.e., each must owe the other in his own name and not as a fiduciary."). "The rationale of this rule is simply that the liability arising from a fiduciary duty is entirely independent of the debt owing from the bankrupt." *Western Dealer Mgmt. v. England (In re Bob Richards Chrysler-Plymouth Corp.), 473 F.2d 262, 265 (9th Cir.1973).*

The fact that one of the parties has a fiduciary [**37] duty in some context, however, does not necessarily preclude mutuality. *In re Fox Bean Co., Inc., 287 B.R. 270, 287 (Bankr. D. Idaho 2002)* (citing 5 COLLIER ON BANKRUPTCY PP 553.03[3][b] and 553.03[3][c][ii] ("the existence of a fiduciary relationship need not prevent mutuality"). A distinction must be drawn between different types of fiduciary relationships. "First, mutuality may be found if setoff would not violate the fiduciary obligation in question, as in the case of certain types of security deposits. Second, mutuality may exist if the party asserting the right of setoff is not the one acting as a fiduciary. Third, the rule does not prevent setoff if the obligations sought to be offset between the parties are unrelated to either party's fiduciary responsibilities." 5 COLLIER ON BANKRUPTCY PP 553.03[3][c][i] (footnotes omitted); *Allegaert v. Perot, 466 F.Supp. 516, 519 (S.D.N.Y. 1978).*

In this case, the Note did not arise out of Ferguson's fiduciary duty. Although Ferguson received a loan in conjunction with his moving expenses, it was not incurred as an exercise of his fiduciary [**38] duties. The fact, alone, that Ferguson was in a position charged with

338 B.R. 627, *; 2006 Bankr. LEXIS 373, **

certain fiduciary duties does not *per se* ban him from asserting any right to setoff.

Accordingly, Ferguson's motion for relief from stay in order to effectuate a setoff is not well premised and is hereby denied. Each party is to bear its respective costs.

**IT IS SO ORDERED.**

Dated, this 10th day of February, 2006.

/s/ Randolph Baxter

UNITED STATES BANKRUPTCY JUDGE

**JUDGMENT**

**In Delaware, in said District, on this 10th day of February, 2006.**

**A Memorandum Of Opinion And Order having been rendered by this Court in this matter.**

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Ferguson's motion for relief from stay in order to effectuate a setoff is not well premised and is hereby denied. Each party is to bear its respective costs.**

**IT IS SO ORDERED.**

/s/ Randolph Baxter

**UNITED STATES BANKRUPTCY JUDGE**

Exhibit C

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GARDEN RIDGE CORPORATION, *et al.*, | Case No. 04-10324 (KJC) |
| Debtors. | (Jointly Administered) |
| GARDEN RIDGE, L.P., | Adv. Pro. No. _____ |
| Plaintiff, | |
| -against- | |
| DANIEL FERGUSON, | |
| Defendant. | |

## COMPLAINT

Garden Ridge L.P. ("GR L.P."), as Plaintiff in the above-captioned adversary proceeding, alleges as follows:

### Nature of Action

1.      Plaintiff seeks a judgment against the Defendant Daniel Ferguson (the "Defendant"), based on the Defendant's breach of contract. Pursuant to Fed.R.Bankr.P. 7001(1), this is a proceeding to recovery money.

### Jurisdiction and Venue

2.      This adversary proceeding arises in and relates to Debtors' chapter 11 cases, which are pending before this Court. This adversary proceeding is brought pursuant to Fed.R.Bankr.P. 7001.

062883.1001

3.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding under 28 U.S.C.§ 157(b)(2)(C) and (O).

4.    Venue over this adversary proceeding is proper in this District under 28 U.S.C. § 1409(a).

### Parties

5.    Garden Ridge Corporation ("GR Corporation") is a Delaware corporation that holds 100% of the equity interests in Garden Ridge Management, Inc., Garden Ridge Finance Corporation and Garden Ridge Investments, Inc. ("GR Management," "GR Finance" and "GR Investments," respectively, and collectively with GR L.P., GR Corporation and Garden Holdings, Inc., the "Debtors"), all of which are Delaware corporations.  Garden Holdings, Inc. is a Delaware corporation that holds 100% of the equity interests in GR Corporation.

6.    GR L.P. is a Texas limited partnership.  GR Investments holds a 99% ownership in GR L.P. as the sole limited partner, and GR Management holds a 1% ownership interest in GR L.P. as the sole general partner.

7.    The Debtors own and operate Garden Ridge, a leading home décor retailer with 35 stores in 13 states throughout the South, Midwest and Mid Atlantic regions.

8.    The Defendant is a former employee of GR Management.  Upon information and belief, the Defendant resides at 49 Murillo Way, Hot Springs Village, Arkansas 71909-5518.

### Background

9.    On or about January 28, 2001, the Defendant executed an employment agreement (the "Agreement") with GR Management to become the Senior Vice President – Supply Chain for the Debtors.

10.   GR Management is a management services company that employs all of the staff and management utilized at the Garden Ridge stores. GR L.P., the entity that operates all of the Garden Ridge stores, pays GR Management a fee for the use of GR Management's employees. Although the officers of GR Management act as the officers of GR L.P., they receive no compensation or benefits from GR L.P. and are not employed by GR L.P.

11.   The Defendant was, at all times, an employee of GR Management.

12.   The Defendant was never employed by any other debtor-entity, including, but not limited to, GR L.P.

13.   On March 8, 2001, the Defendant caused a loan to be issued to himself from GR L.P. evidenced by a note (the "First Note," a copy of which is annexed hereto as Exhibit A) in favor GR L.P. in the amount of $250,000.00, plus interest at a rate of 5.75% per annum.

14.   The Defendant has never made any payments with regard to the First Note.

15.   On January 1, 2002, the Defendant caused a second, replacement loan to be issued to himself from GR L.P. evidenced by a note (the "Second Note," a copy of which is annexed hereto as Exhibit B) in favor GR L.P. in the amount of $250,000.00, plus interest at the reduced rate of 2.75% per annum.

16.   The principal of the Second Note satisfied the principal and interest due on the First Note up to $250,000, leaving a balance of principal on the First Note of approximately $11,735.24.

17.   The Defendant has never made any payments with regard to the Second Note.

18.    On January 1, 2003, the Defendant caused a third, replacement loan to be issued to himself from GR L.P. evidenced by a note (the "Third Note," a copy of which is annexed hereto as Exhibit C, and together with the First Note and Second Note, the "Notes") in favor GR L.P. in the amount of $250,000.00, plus interest at the rate of 2.75% per annum.

19.    In addition to principal and interest, the Third Note provides that

> If any holder of this note retains an attorney in connection with any []
> default or to collect, enforce or defend this note...in any lawsuit...,
> reorganization, bankruptcy or other proceeding, or if the Maker sues any
> holder in connection with this note or any such papers and does not
> prevail, then Maker agrees to pay to each such holder, in addition to
> principal and interest, all reasonable costs and expenses incurred by such
> holder in trying to collect this note or in any such suit or proceeding,
> including reasonable attorneys' fees.

Third Note, at p. 1.

20.    The principal of the Third Note satisfied the principal and interest due on the Second Note up to $250,000, leaving a balance of principal on the Second Note of approximately $6,875.00.

21.    The Notes were issued by GR L.P.

22.    The Third Note became due and payable upon the earlier to occur of (i) thirty (30) days after the closing of the sale of the Defendant's real property in Michigan, (ii) the date of the Defendant's termination of employment with or without cause, and (iii) December 31, 2003.

23.    In or about September, 2003, the Defendant's employment was terminated.

24.    The final maturity date of the Third Note has passed.

25.    The Defendant has made no payments in satisfaction of the Third Note.

26.    GR L.P. fully performed its obligations under the Notes.

27.    On April 14, 2004, the Defendant filed his *Motion of Daniel Ferguson for Relief from the Automatic Stay Under § 362(d)(1) of the Bankruptcy Code to the Extent Necessary to Set Off Mutual Debts* (the "Motion") [*see* Docket No. 1518] wherein the Defendant conceded that the Third Note is due and characterized GR L.P.'s claim with respect to the Third Note as "valid" and "enforceable." *See* Motion, at ¶ 7 ("As of the Petition Date, Mr. Ferguson was indebted to the Debtors in the sum of $250,000"); *id.* at ¶ 17 (characterizing GR L.P's claim with respect to the Third Note as "valid" and "enforceable").

28.    On February 14, 2006, this Court issued its *Memorandum of Opinion and Order* (the "Order") [*see* Docket No. 2064] denying the Motion and entered a judgment (the "Judgment") [*see* Docket No. 2066] against the Defendant.

29.    On February 20, 2006, the Defendant file a Notice of Appeal of the Order and Judgment (the "Appeal").

### Count I

### Breach of Contract (First Note)

30.    GR L.P. repeats, realleges and incorporates the allegations of Paragraphs 1 through 29 above as if fully stated here.

31.    The Defendant is in breach of his contract with GR L.P. by failing to pay the entirety of the First Note when due.

32.    The Defendant's breach of contract with respect to the First Note has damaged GR L.P. in an amount to be determined at trial, but currently believed to be no less than $11,735.24.

## Count II

### Breach of Contract (Second Note)

33.     GR L.P. repeats, realleges and incorporates the allegations of Paragraphs 1 through 32 above as if fully stated here.

34.     The Defendant is in breach of his contract with GR L.P. by failing to pay the entirety of the Second Note when due.

35.     The Defendant's breach of contract with respect to the Second Note has damaged GR L.P. in an amount to be determined at trial, but currently believed to be no less than $6,875.00.

## Count III

### Breach of Contract (Third Note)

36.     GR L.P. repeats, realleges and incorporates the allegations of Paragraphs 1 through 35 above as if fully stated here.

37.     The Defendant is in breach of his contract with GR L.P. by failing to pay principal and interest on the Third Note when due.

38.     The Defendant's breach of contract with respect to the Third Note has damaged GR L.P. in an amount to be determined at trial, but currently believed to be no less than $272,402.72.

## Count IV

### Attorneys' Fees and Costs

39.     GR L.P. repeats, realleges and incorporates the allegations of Paragraphs 1 through 38 above as if fully stated here.

40.    Pursuant to the Notes, GR L.P. is entitled to all reasonable costs and expenses, including reasonable attorneys' fees, in any action in defense of the Notes or to the extent the Defendant sues GR L.P. in connection with the Notes and does not prevail.

41.    GR L.P. is entitled to all reasonable costs and expenses, including reasonable attorneys' fees, in connection with defending against the Motion and Appeal, and filing and prosecuting the instant proceeding, in an amount to be determined at trial, but currently believed to be no less than $45,000.00.

### Prayer for Relief

WHEREFORE, GR L.P. requests that the Court enter a judgment:

A.    finding the Defendant in breach of the First Note and awarding GR L.P. damages in an amount to be determined at trial, plus pre- and post-judgment interest on that amount;

B.    finding the Defendant in breach of the Second Note and awarding GR L.P. damages in an amount to be determined at trial, plus pre- and post-judgment interest on that amount;

C.    finding the Defendant in breach of the Third Note and awarding GR L.P. damages in an amount to be determined at trial, plus pre- and post-judgment interest on that amount;

D. awarding GR L.P. the costs of defending against the Motion, Appeal and this proceeding, including but not limited to all reasonable attorneys' fees and costs;

E. granting other relief that the Court deems just and proper.

Dated: Wilmington, Delaware
March 7, 2006

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

Pauline K. Morgan (Del. Bar No. 3650)
Seth J. Reidenberg, Esquire (Del. Bar No. 3657)
Joseph M. Barry (Del. Bar No. 4221)
Sean T. Greecher (Del. Bar No. 4484)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Attorneys for GR L.P.

# Exhibit A

Houston, Texas                     March 8, 2001

$250,000.00

FOR VALUE RECEIVED, DAN FERGUSON, ("Maker") promises to pay to the order of GARDEN RIDGE, L.P. ("Payee"), at 19411 Atrium Place, Suite 170, Houston, Harris County, Texas 77084, or at such other place as the holder of this note may hereafter designate in writing, in immediately available funds and in lawful money of the United States of America, the principal sum of TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00). Interest shall accrue on such obligation at [5.75%], per annum. Interest on this obligation shall be computed for the actual number of days elapsed in a year consisting of 365 or 366 days, as the case may be.

The principal of this note and all accrued and unpaid interest on the principal of this note shall be due and payable on the earlier of (i) thirty (30) days after the closing of the sale of all or any portion of Maker's interest in the real property or improvements thereon located at 3510 Vineyard Hill Drive in Rochester, Michigan; (ii) the date of the termination of Maker's employment with Payee or any of Payee's affiliates for any reason or no reason, regardless of whether such termination occurs by action of Maker or Payee; or (iii) December 31, 2001, the earlier of such dates being the final maturity of this note.

Maker may at any time pay the full amount or any part of this note without payment of any premium or fee. All prepayments shall be applied first to accrued interest, the balance to principal.

Maker's failure to pay any principal or accrued interest owing on this note when due or the occurrence of any default under any writing related to this note shall constitute default under this note, whereupon the holder of this note may elect to exercise any or all rights, powers and remedies afforded (a) under all writings related to this note and (b) by law, including the right to accelerate the maturity of this entire note.

If any holder of this note retains an attorney in connection with any such default or to collect, enforce or defend this note or any papers intended to secure or guarantee it in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Maker sues any holder in connection with this note or any such papers and does not prevail, then Maker agrees to pay to each such holder, in addition to principal and interest, all reasonable costs and expenses incurred by such holder in trying to collect this note or in any such suit or proceeding, including reasonable attorneys' fees. An amount equal to ten percent (10%) of the unpaid principal and accrued interest owing on this note when and if this note is placed in the hands of an attorney for collection after default is stipulated to be reasonable attorneys' fees unless a holder or any maker of this note timely pleads otherwise to a court of competent jurisdiction.

Maker and any and all co-makers, endorsers, guarantors and sureties severally waive notice (including, but not limited to, notice of intent to accelerate and notice of acceleration,

INITIALLED FOR
INDETIFICATION

HOUSTON 01401S/00000 477397V3          Page 1 of 3 Pages                    GR474

notice of protest and notice of dishonor), demand, presentment for payment, protest, diligence in collecting and the filing of suit for the purpose of fixing liability and consent that the time of payment hereof may be extended and re-extended from time to time without notice to any of them. Each such person agrees that his, her or its liability on or with respect to this note shall not be affected by any release of or change in any guaranty or security at any time existing or by any failure to perfect or maintain perfection of any lien against or security interest in any such security or the partial or complete unenforceability of any guaranty or other surety obligation, in each case in whole or in part, with or without notice and before or after maturity.

Notwithstanding any provision to the contrary contained in this note or any other writing relating to this note, it is expressly provided that in no case or event shall the aggregate of (i) all interest on the unpaid balance of this note, accrued or paid from the date hereof and (ii) the aggregate of any other amounts accrued or paid pursuant to this note or any other writing relating to this note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this note from the date hereof, ever exceed the Ceiling Rate (as hereinafter defined). In this connection, Maker and Payee stipulate and agree that it is their common and overriding intent to contract in strict compliance with applicable usury laws. In furtherance thereof, none of the terms of this note or any other writing relating to this note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Ceiling Rate. Maker or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this note shall never be liable for interest in excess of the Ceiling Rate. If, for any reason whatever, the interest paid or received on this note during its full term produces a rate which exceeds the Ceiling Rate, the holder of this note shall credit against the principal of this note (or, if such indebtedness shall have been paid in full, shall refund to the payor of such interest) such portion of said interest as shall be necessary to cause the interest paid on this note to produce a rate equal to the Ceiling Rate. All sums paid or agreed to be paid to the holder of this note for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this note, so that the interest rate is uniform throughout the full term of this note. The provisions of this paragraph shall control all agreements, whether now or hereafter existing and whether written or oral, between Maker and Payee. As used herein, the term "Ceiling Rate" means, on any day, the maximum nonusurious rate of interest permitted for that day by whichever of applicable federal or Texas laws permits the higher interest rate, stated as a rate per annum. On each day, if any, that applicable Texas law establishes the Ceiling Rate, the Ceiling Rate shall be the "weekly ceiling" (as defined in §303 of the Texas Finance Code — the "*Texas Finance Code*" — and Chapter 1D of Title 79, Texas Rev. Civ. Stats. 1925 — "*Chapter 1D*", as amended, respectively) for that day. Payee may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code or Chapter 1D by notice to Maker if and to the extent permitted by the Texas Finance Code or Chapter 1D. Without notice to Maker or any other person or entity, the Ceiling Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates. Maker warrants and represents to Payee and all other holders of this note that all loans evidenced by this note are and will be for business, commercial, investment or other similar purpose and not primarily for personal, family, household or agricultural use, as such terms are used in Chapter 1D or the Texas Finance Code.

INITIALLED FOR
INDETIFICATION

This note shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America from time to time in effect. Harris County, Texas shall be a proper place of venue for suit hereon. Maker and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceedings in respect of this note or any loan agreement, security agreement, guaranty or other writing relating hereto shall be brought in the district courts of Harris County, Texas, or the United States District Court for the Southern District of Texas, Houston Division.

MAKER

DAN FERGUSON

INITIALLED FOR
INDETIFICATION

HOUSTON 014013\000000 477/597v3

Page 3 of 3 Pages

GR476

# <u>Exhibit B</u>

$250,000.00

Houston, Texas

January 1, 2002

FOR VALUE RECEIVED, DAN FERGUSON, ("Maker") promises to pay to the order of GARDEN RIDGE, L.P. ("Payee"), at 19411 Atrium Place, Suite 170, Houston, Harris County, Texas 77084, or at such other place as the holder of this note may hereafter designate in writing, in immediately available funds and in lawful money of the United States of America, the principal sum of NINETY THOUSAND AND NO/100 DOLLARS ($250,000.00). Interest shall accrue on such obligation at [9.75%], per annum. Interest on this obligation shall be computed for the actual number of days elapsed in a year consisting of 365 or 366 days, as the case may be.

The principal of this note and all accrued and unpaid interest on the principal of this note shall be due and payable on the earlier of (i) thirty (30) days after the closing of the sale of all or any portion of Maker's interest in the real property or improvements thereon located at 3510 Vineyard Hill Drive in Rochester, Michigan; (ii) the date of the termination of Maker's employment with Payee or any of Payee's affiliates for any reason or no reason, regardless of whether such termination occurs by action of Maker or Payee; or (iii) December 31, 2002, the earlier of such dates being the final maturity of this note.

Maker may at any time pay the full amount or any part of this note without payment of any premium or fee. All prepayments shall be applied first to accrued interest, the balance to principal.

Maker's failure to pay any principal or accrued interest owing on this note when due or the occurrence of any default under any writing related to this note shall constitute default under this note, whereupon the holder of this note may elect to exercise any or all rights, powers and remedies afforded (a) under all writings related to this note and (b) by law, including the right to accelerate the maturity of this entire note.

If any holder of this note retains an attorney in connection with any such default or to collect, enforce or defend this note or any papers intended to secure or guarantee it in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Maker sues any holder in connection with this note or any such papers and does not prevail, then Maker agrees to pay to each such holder, in addition to principal and interest, all reasonable costs and expenses incurred by such holder in trying to collect this note or in any such suit or proceeding, including reasonable attorneys' fees. An amount equal to ten percent (10%) of the unpaid principal and accrued interest owing on this note when and if this note is placed in the hands of an attorney for collection after default is stipulated to be reasonable attorneys' fees unless a holder or any maker of this note timely pleads otherwise to a court of competent jurisdiction.

Maker and any and all co-makers, endorsers, guarantors and sureties severally waive notice (including, but not limited to, notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor), demand, presentment for payment, protest, diligence in

INNITIALLED FOR
INDETIFICATION

Sep 30 03 10:08a    Garden Ridge - Corp. HR    281-646-0818    p.9

collecting and the filing of suit for the purpose of fixing liability and consent that the time of payment hereof may be extended and re-extended from time to time without notice to any of them. Each such person agrees that his, her or its liability on or with respect to this note shall not be affected by any release of or change in any guaranty or security at any time existing or by any failure to perfect or maintain perfection of any lien against or security interest in any such security or the partial or complete unenforceability of any guaranty or other surety obligation, in each case in whole or in part, with or without notice and before or after maturity.

Notwithstanding any provision to the contrary contained in this note or any other writing relating to this note, it is expressly provided that in no case or event shall the aggregate of (i) all interest on the unpaid balance of this note, accrued or paid from the date hereof and (ii) the aggregate of any other amounts accrued or paid pursuant to this note or any other writing relating to this note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this note from the date hereof, ever exceed the Ceiling Rate (as hereinafter defined). In this connection, Maker and Payee stipulate and agree that it is their common and overriding intent to contract in strict compliance with applicable usury laws. In furtherance thereof, none of the terms of this note or any other writing relating to this note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Ceiling Rate. Maker or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this note shall never be liable for interest in excess of the Ceiling Rate. If, for any reason whatever, the interest paid or received on this note during its full term produces a rate which exceeds the Ceiling Rate, the holder of this note shall credit against the principal of this note (or, if such indebtedness shall have been paid in full, shall refund to the payor of such interest) such portion of said interest as shall be necessary to cause the interest paid on this note to produce a rate equal to the Ceiling Rate. All sums paid or agreed to be paid to the holder of this note for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this note, so that the interest rate is uniform throughout the full term of this note. The provisions of this paragraph shall control all agreements, whether now or hereafter existing and whether written or oral, between Maker and Payee. As used herein, the term "Ceiling Rate" means, on any day, the maximum nonusurious rate of interest permitted for that day by whichever of applicable federal or Texas laws permits the higher interest rate, stated as a rate per annum. On each day, if any, that applicable Texas law establishes the Ceiling Rate, the Ceiling Rate shall be the "weekly ceiling" (as defined in §303 of the Texas Finance Code — the "Texas Finance Code" — and Chapter 1D of Title 79, Texas Rev. Civ. Stats. 1925 — "Chapter 1D", as amended, respectively) for that day. Payee may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code or Chapter 1D by notice to Maker if and to the extent permitted by the Texas Finance Code or Chapter 1D. Without notice to Maker or any other person or entity, the Ceiling Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates. Maker warrants and represents to Payee and all other holders of this note that all loans evidenced by this note are and will be for business, commercial, investment or other similar purpose and not primarily for personal, family, household or agricultural use, as such terms are used in Chapter 1D or the Texas Finance Code.

INITIALLED FOR
INDEFTIFICATION

This note shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America from time to time in effect. Harris County, Texas shall be a proper place of venue for suit hereon. Maker and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceedings in respect of this note or any loan agreement, security agreement, guaranty or other writing relating hereto shall be brought in the district courts of Harris County, Texas, or the United States District Court for the Southern District of Texas, Houston Division.

MAKER

DAN FERGUSON

INITIALLED FOR
INDETIFICATION

HOUSTON 01401S/00000 473397v2

# **Exhibit C**

$250,000.00          Houston, Texas          January 1, 2003

FOR VALUE RECEIVED, DAN FERGUSON, ("Maker") promises to pay to the order of GARDEN RIDGE, L.P. ("Payee"), at 19411 Atrium Place, Suite 170, Houston, Harris County, Texas 77084, or at such other place as the holder of this note may hereafter designate in writing, in immediately available funds and in lawful money of the United States of America, the principal sum of TWO HUNDRED FIFTY THOUSAND AND NO/100($250,000.00). Interest shall accrue on such obligation at [2.75%], per annum. Interest on this obligation shall be computed for the actual number of days elapsed in a year consisting of 365 or 366 days, as the case may be.

The principal of this note and all accrued and unpaid interest on the principal of this note shall be due and payable on the earlier of (i) thirty (30) days after the closing of the sale of all or any portion of Maker's interest in the real property or improvements thereon located at 3510 Vineyard Hill Drive in Rochester, Michigan; (ii) the date of the termination of Maker's employment with Payee or any of Payee's affiliates for any reason or no reason, regardless of whether such termination occurs by action of Maker or Payee; or (iii) December 31, 2003, the earlier of such dates being the final maturity of this note.

Maker may at any time pay the full amount or any part of this note without payment of any premium or fee. All prepayments shall be applied first to accrued interest, the balance to principal.

Maker's failure to pay any principal or accrued interest owing on this note when due or the occurrence of any default under any writing related to this note shall constitute default under this note, whereupon the holder of this note may elect to exercise any or all rights, powers and remedies afforded (a) under all writings related to this note and (b) by law, including the right to accelerate the maturity of this entire note.

If any holder of this note retains an attorney in connection with any such default or to collect, enforce or defend this note or any papers intended to secure or guarantee it in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Maker sues any holder in connection with this note or any such papers and does not prevail, then Maker agrees to pay to each such holder, in addition to principal and interest, all reasonable costs and expenses incurred by such holder in trying to collect this note or in any such suit or proceeding, including reasonable attorneys' fees. An amount equal to ten percent (10%) of the unpaid principal and accrued interest owing on this note when and if this note is placed in the hands of an attorney for collection after default is stipulated to be reasonable attorneys' fees unless a holder or any maker of this note timely pleads otherwise to a court of competent jurisdiction.

Maker and any and all co-makers, endorsers, guarantors and sureties severally waive notice (including, but not limited to, notice of intent to accelerate and notice of acceleration,

INITIALLED FOR
INDETIFICATION

HOUSTON 01401500000 47139740

Page 1 of 3 Pages

GR466

notice of protest and notice of dishonor), demand, presentment for payment, protest, diligence in collecting and the filing of suit for the purpose of fixing liability and consent that the time of payment hereof may be extended and re-extended from time to time without notice to any of them. Each such person agrees that his, her or its liability on or with respect to this note shall not be affected by any release of or change in any guaranty or security at any time existing or by any failure to perfect or maintain perfection of any lien against or security interest in any such security or the partial or complete unenforceability of any guaranty or other surety obligation, in each case in whole or in part, with or without notice and before or after maturity.

Notwithstanding any provision to the contrary contained in this note or any other writing relating to this note, it is expressly provided that in no case or event shall the aggregate of (i) all interest on the unpaid balance of this note, accrued or paid from the date hereof and (ii) the aggregate of any other amounts accrued or paid pursuant to this note or any other writing relating to this note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this note from the date hereof, ever exceed the Ceiling Rate (as hereinafter defined). In this connection, Maker and Payee stipulate and agree that it is their common and overriding intent to contract in strict compliance with applicable usury laws. In furtherance thereof, none of the terms of this note or any other writing relating to this note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Ceiling Rate. Maker or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this note shall never be liable for interest in excess of the Ceiling Rate. If, for any reason whatever, the interest paid or received on this note during its full term produces a rate which exceeds the Ceiling Rate, the holder of this note shall credit against the principal of this note (or, if such indebtedness shall have been paid in full, shall refund to the payor of such interest) such portion of said interest as shall be necessary to cause the interest paid on this note to produce a rate equal to the Ceiling Rate. All sums paid or agreed to be paid to the holder of this note for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this note, so that the interest rate is uniform throughout the full term of this note. The provisions of this paragraph shall control all agreements, whether now or hereafter existing and whether written or oral, between Maker and Payee. As used herein, the term "Ceiling Rate" means, on any day, the maximum nonusurious rate of interest permitted for that day by whichever of applicable federal or Texas laws permits the higher interest rate, stated as a rate per annum. On each day, if any, that applicable Texas law establishes the Ceiling Rate, the Ceiling Rate shall be the "weekly ceiling" (as defined in §303 of the Texas Finance Code — the "*Texas Finance Code*" — and Chapter 1D of Title 79, Texas Rev. Civ. Stats. 1925 — "*Chapter 1D*", as amended, respectively) for that day. Payee may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code or Chapter 1D by notice to Maker if and to the extent permitted by the Texas Finance Code or Chapter 1D. Without notice to Maker or any other person or entity, the Ceiling Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates. Maker warrants and represents to Payee and all other holders of this note that all loans evidenced by this note are and will be for business, commercial, investment or other similar purpose and not primarily for personal, family, household or agricultural use, as such terms are used in Chapter 1D or the Texas Finance Code.

INITIALLED FOR INDETIFICATION

This note shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America from time to time in effect. Harris County, Texas shall be a proper place of venue for suit hereon. Maker and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceedings in respect of this note or any loan agreement, security agreement, guaranty or other writing relating hereto shall be brought in the district courts of Harris County, Texas, or the United States District Court for the Southern District of Texas, Houston Division.

MAKER

DAN FERGUSON

GR468

INITIALLED FOR
INDETIFICATION

HOUSTON:014015/00000 477197v3

Sep 30 03 10:07a     Garden Ridge - Corp. HR     281-646-0818     p.8

Exhibit D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| | : | |
| **GARDEN RIDGE CORPORATION et al.,** | : | **Case No. 04-10324 (KJC)** |
| | : | **Jointly Administered** |
| Debtors. | : | |
| | : | |
| **GARDEN RIDGE, L.P.,** | : | |
| | : | **Adv. Proc.: 06-50558 (KJC)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **DANIEL FERGUSON,** | : | |
| | : | |
| Defendant. | : | |

## ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND DEMAND FOR JURY TRIAL

Daniel Ferguson ("Defendant" or "Ferguson"), by and through his undersigned counsel, Buchanan Ingersoll PC, hereby files his *Answer to Complaint, Affirmative Defenses and Demand for Jury Trial* in the above-captioned adversary proceeding, and in support thereof, avers as follows:

### Nature of Action

1.     Denied as stated.  Admitted only that Plaintiff seeks a judgment against the Defendant on a theory of breach of contract and seeks monetary damages.  All other allegations of paragraph 1 of the Complaint are denied.

### Jurisdiction and Venue

2.     Admitted.

3.     Denied.  Defendant requests trial by jury in this matter, Defendant does not consent to the entry of a final order or judgment by the bankruptcy judge, and seeks to withdraw the reference to the bankruptcy court with respect to this matter.

4.     Admitted.

### Parties

5.     Admitted.

6.     Admitted.

7.     Admitted.

8.     Denied as stated.  Admitted only that Defendant resides at 49 Murillo Way, Hot Springs Village, Arkansas 71909-5518.  All other allegations of paragraph 8 of the Complaint are denied.

### Background

9.     Denied as stated.  Admitted only that Defendant executed an employment agreement ("Agreement") and became the Senior Vice President -- Supply Chain for all the Debtors.  All other allegations of paragraph 9 of the Complaint are denied.

10.     Denied.

11.     Denied.

12.     Denied.

13.     Denied as stated.  Admitted only that Defendant received a loan from the Debtors that was evidenced by, and in the amounts ascribed to, the "First Note" described in the Complaint.  All other allegations of paragraph 13 of the Complaint are denied.

14.     Admitted.

15.    Denied as stated.  Admitted only that the Debtors caused the replacement "Second Note" described in the Complaint to be drafted and that such Second Note was executed by Defendant.  All other allegations of paragraph 15 of the Complaint are denied.

16.    Denied as stated.  Admitted only that the Second Note satisfied the obligations stated in, and replaced, the First Note.  All other allegations of paragraph 16 of the Complaint are denied.

17.    Admitted.

18.    Denied as stated.  Admitted only that the Debtors caused the replacement "Third Note" described in the Complaint to be drafted and that such Third Note was executed by Defendant.  All other allegations of paragraph 18 of the Complaint are denied.

19.    Admitted only that the language referred to in this paragraph is contained in the Third Note.  All other allegations of paragraph 19 of the Complaint are denied.

20.    Denied as stated.  Admitted only that the Third Note satisfied the obligations stated in, and replaced, the Second Note.  All other allegations of paragraph 20 of the Complaint are denied.

21.    Admitted.

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Admitted.

26.    Admitted.

27.    Admitted only that the language referenced by Plaintiff was contained in the referenced pleading, and that the pleading was filed by counsel for Ferguson.  Defendant denies

the validity of Plaintiff's characterization of that pleading or the referenced language. All other allegations of paragraph 27 of the Complaint are denied.

28.     Admitted.

29.     Admitted.

## Count I

### Breach of Contract (First Note)

30.     Defendant repeats and re-alleges his responses to paragraphs 1 through 29 of the Complaint, above, as though set forth herein.

31.     Denied.

32.     Denied.

## Count II

### Breach of Contract (Second Note)

33.     Defendant repeats and re-alleges his responses to paragraphs 1 through 32 of the Complaint, above, as though set forth herein.

34.     Denied.

35.     Denied.

## Count III

### Breach of Contract (Third Note)

36.     Defendant repeats and re-alleges his responses to paragraphs 1 through 35 of the Complaint, above, as though set forth herein.

37.     Denied.

38.     Denied.

### Count IV

### Attorney's Fees and Costs

39.    Defendant repeats and re-alleges his responses to paragraphs 1 through 38 of the Complaint, above, as though set forth herein.

40.    Denied as stated.

41.    Denied.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the common-law doctrine of set-off.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of estoppel.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred under the doctrines of accord and satisfaction and ratification.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff is precluded from maintaining this action due to unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because one or more of the Debtors failed to mitigate damages.

### PRAYER FOR JURY TRIAL

Defendant hereby Requests a jury trial in this matter.

WHEREFORE, Daniel Ferguson respectfully requests that the Court dismiss the Complaint in its entirety and that the Court grant such other and further relief as justice shall require.

Dated:  April 6, 2006
Wilmington, Delaware

**BUCHANAN INGERSOLL PC**

By:    /s/    *William D. Sullivan*
          William D. Sullivan (No. 2820)
          1007 North Orange St., Suite 1110
          Wilmington, DE  19801-1236
          Tel:    (302) 428-5523
          Fax:    (302) 428-3996

*Counsel to Daniel Ferguson*

Exhibit E

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

GARDEN RIDGE CORPORATION et al.,

Debtors.

———————————————————————

GARDEN RIDGE, L.P.,

Plaintiff,

v.

DANIEL FERGUSON,

Defendant.

———————————————————————

Chapter 11

Bankr. Case No.: 04-10324 (KJC)
Jointly Administered

Bankr. Adv. Proc.: 06-50558 (KJC)

## MOTION OF DANIEL FERGUSON FOR WITHDRAWAL OF THE REFERENCE TO THE BANKRUPTCY COURT AND DEMAND FOR JURY TRIAL

Defendant Daniel Ferguson ("Defendant"), by and through his undersigned counsel,

Buchanan Ingersoll PC, hereby files this Motion, pursuant to 28 U.S.C. § 157(d), Federal Rule

of Bankruptcy Procedure 5011 and Rule 5011-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware, seeking an order

from the District Court withdrawing the reference to the United States Bankruptcy Court for the

District of Delaware (the "Bankruptcy Court") of the above captioned adversary proceeding and

demanding jury trial and, in support thereof, states as follows:

## I.    FACTUAL AND PROCEDURAL BACKGROUND

1.    On or about February 2, 2004, Garden Ridge Corporation and its affiliates, including Plaintiff, Garden Ridge, L.P. ("Plaintiff") and Garden Ridge Management, Inc. (collectively, "Garden Ridge" or "Debtors") filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code ("Code" or "Bankruptcy Code").  Pursuant to 28 U.S.C. § 157(a), the case was automatically referred to the Bankruptcy Court.

2.    On March 7, 2006, Plaintiff initiated an adversary proceeding ("Adversary Proceeding") by filing a complaint ("Complaint"), alleging breach of contract and seeking recovery on a Note from Defendant issued in favor of Plaintiff.

3.    On April 6, 2006, Defendant filed an Answer to the Complaint in which he denied that the Bankruptcy Court has core jurisdiction over this adversary proceeding, stated that he does not consent to the entry of a final order or judgment in this matter by the Bankruptcy Court, and included a prayer for trial by jury.

4.    Contemporaneously with the filing of this Motion, Defendant has filed the *Motion of Daniel Ferguson to Determine Core or Non-Core Status*, seeking a determination from the Bankruptcy Court that the pre-petition breach of contract claims raised in the Complaint are non-core in nature, because they raise no substantive right created by Title 11, United States Code, and are claims that could have been made outside of the context of the Plaintiff's bankruptcy case.

5.    The instant case is a non-core matter as to which permissive withdrawal of the reference under 28 U.S.C. § 157(d) is appropriate.  In addition, Defendant has made, and hereby repeats, its demand for a jury trial in the Adversary Proceeding. The Bankruptcy Court lacks

jurisdiction to conduct jury trials and, therefore, Defendant is entitled to a jury trial before the

District Court.

## II.    RELIEF REQUESTED AND BASIS FOR RELIEF

6.    The withdrawal of the reference of bankruptcy cases and proceedings to the

Bankruptcy Court is governed by 28 U.S.C. §157(d). Section 157(d) provides as follows:

> The district court may withdraw, in whole or in part, any case or proceeding
> referred under this section, on its own motion or on timely motion of any party,
> for cause shown. The district court shall, on timely motion of any party, so
> withdraw a proceeding if the court determines that resolution of the proceeding
> requires consideration of both title 11 and other laws of the United States
> regulating organizations or activities affecting interstate commerce.

28 U.S.C. §157(d).

Pursuant to Fed. R. Bnkr. P. 5011(a), "[a] motion for withdrawal of a case or proceeding shall be

heard by a district judge."

7.    Section 157(d) provides for two types of withdrawal: mandatory and permissive.

*In re American Capital Equip., LLC*, 324 B.R. 570, 572 (W.D. Pa. 2005). As Section 157 makes

clear, withdrawal of the reference is mandatory only where the Bankruptcy Court would be

required to interpret and decide substantive issues of federal, non-bankruptcy law. In other

cases, withdrawal is a matter for the district court's discretion. This breach of contract action

does not involve substantive issues of federal law mandating withdrawal, so the standards of

permissive withdrawal are applicable here. *Id.*

8.    Generally, the first inquiry for a court considering permissive withdrawal is

whether the bankruptcy proceeding is core or non-core. *See In re Northwestern Inst. of

Psychiatry, Inc.*, 272 B.R. 104, 107 (E.D. Pa. 2001). Defendant believes this matter to be clearly

non-core because it involves a simple common-law breach of contract and collection action that

is neither derived from nor authorized by Title 11, and which could be freely brought against

3

Defendant in non-bankruptcy state or federal fora. This issue is addressed in the *Motion of Daniel Ferguson to Determine Core or Non-Core Status,* which Defendant has filed contemporaneously with this Motion, pursuant to Local Rule 5011-1. Because "a bankruptcy judge may not enter a final order or judgment in a non-core proceeding, a reference is much more likely to be withdrawn if the proceeding is non-core." *In re Philadelphia Training Center Corp.*, 155 B.R. 109, 112 (E.D. Pa. 1993). Defendant therefore submits that, as the claims at issue concern non-core matters as to which Defendant would otherwise be entitled to jury trial, the reference should be withdrawn.

   9.     Permissive withdrawal under 28 U.S.C. § 157(d) is based on "cause shown." While the statute does not provide a definition of "for cause shown", case law enumerates five factors that a district court should consider in determining whether "cause" exists: "(1) promoting uniformity of bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering economical use of debtor/creditor resources; (4) expediting the bankruptcy process; and (5) timing of the request for withdrawal." *In re American Capital Equip., LLC*, 324 B.R. 570, 573 (W.D. Pa. 2005) (citing *In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir.1990)). The five factors above are non-exclusive bases for a finding of cause, and the Court is free to consider other relevant issues, including, as aforementioned, the core or non-core nature of the claims.

**A.     Cause Exists To Withdraw The Reference Based On The Five-Factor Analysis**

   10.     The five-factor analysis set forth in *American Capital* and *Pruitt* militates in favor of withdrawal of the reference in this instances, especially in the context of the non-core nature of Plaintiff's claims. *See American Capital*, 324 B.R. at 573. A review of those factors follows.

1.  **Uniformity of Bankruptcy Administration and Avoidance of Forum Shopping**

11.    Withdrawal of the reference will promote uniformity of bankruptcy administration and avoid forum shopping.  Plaintiff's Complaint states a state-law cause of action for breach of contract that has no essential relationship to bankruptcy law or the administration of the Debtors' bankruptcy cases.  Defendant may assert counterclaims, third-party claims and defenses (and has already asserted jury trial rights) against Plaintiff that have no, or merely a *de minimis,* connection to the bankruptcy court system or to Title 11.  Indeed, the parties to this adversary proceeding are already parties to a pre-petition Texas state-court action brought by Mr. Ferguson that is currently stayed pursuant to 11 U.S.C. § 362, in which the claims asserted in the Complaint could be litigated as permissive counterclaims.  This common-law breach of contract action, brought by post-confirmation Debtors, reaches unnecessarily beyond the Bankruptcy Court's core jurisdiction and thereby undermines the uniformity of bankruptcy administration. Moreover, the Debtors' election to file the Complaint as a Bankruptcy adversary proceeding deprives Defendant of his right to a jury trial, a right available in all other fora where the Complaint could be brought.

2.    **Fostering the Economical Use of Debtor/Creditor Resources**

12.    Permitting this matter to continue in the Bankruptcy Court will not foster "the economical use of debtor/creditor resources" because the claims at issue are non-core and Defendant has not consented to the Bankruptcy Court's jurisdiction as to Plaintiff's breach of contract claims, or to its entry of a final order or judgment.  Rule 7012 of the Federal Rules of Bankruptcy Procedure provides that "in non-core proceedings, final orders and judgments shall not be entered on the bankruptcy judge's order, except by express consent of the parties." Fed.R.Bankr.P. 7012(b)  Thus, because the Bankruptcy Court will be unable to issue a final order

or judgment or prepare for a jury trial, the expenditure of fees and expenses by the parties in continuing with litigation in the Bankruptcy Court will be, at best, inefficient, and at worst, wasteful.

### 3.    Expediting the Bankruptcy Process

13.    The Debtors' attempt to prosecute these claims in their bankruptcy cases will not "[expedite] the bankruptcy process", but will needlessly expend the judicial resources of the Bankruptcy Court, to the potential detriment of these Debtors' estates and other petitioners to the Bankruptcy Court. *Id.* While use of the Bankruptcy Court's resources is certainly appropriate for Title 11 issues, the claims alleged in the Complaint do not arise under Title 11 and are neither necessary to the administration of the Debtors' estates, nor are they claims (such as avoidance actions) that rely on the powers or status of a trustee in bankruptcy. Therefore, resolution outside of the Bankruptcy Court should be preferred.

### 4.    Timeliness of Motion to Withdraw the Reference

14.    Finally, the timing of Defendant's request is reasonable. *Id.* The instant Motion was filed only 30 days after the filing of the Complaint and three days after the Answer[1], which expressly asserted Defendant's belief that the claims at issue were non-core, and included his demand for jury trial and rejection of bankruptcy court jurisdiction. *See e.g. In re Almac's, Inc.*, 202 B.R. 648, ___ (D.R.I., 1996) (Motion to withdraw was timely filed two months after filing of complaint). No possible prejudice to Plaintiff or any other party will result from the filing of this Motion at this time: no scheduling order has been issued, no discovery or trial preparation has taken place, nor has the lapse of time affected the availability of witnesses or information

---

[1] The parties agreed to stay all proceedings in the Adversary Proceeding, including the filing of this Motion, as set forth on the record at the status conference held on April 11, 2006, pending mediation in the District Court appeal. That mediation concluded on or about May 19, 2006. The stay was further continued until June 21, 2006, pursuant to a subsequent stipulation, at the request of counsel to the Plaintiff. As set forth in the stipulation approved by the Court, the agreement to delay filing the Motion shall not affect the timeliness of the Motion under this analysis.

necessary for the Plaintiff to prove its claims. *See e.g. Auto Specialties Mfg. v. Sachs*, 134 B.R. 227, ___ (W.D. Mich. 1990).

**B.      Permissive Withdrawal Is Necessary To Protect Defendant's Seventh Amendment Rights**

15.     In addition to the factors above and the non-core nature of the claims, Defendant has asserted Seventh Amendment rights that would be denied by trial in the Bankruptcy Court. Because the Complaint asserts a private cause of action at law, these jury trial rights are constitutionally protected. Given the Bankruptcy Court's inability to conduct jury trials, withdrawal of the reference is necessary to preserve these constitutional rights.

16.     The United States Supreme Court has made clear that Seventh Amendment jury trial rights will be protected in matters involving rights of action at law that are personal in nature and that do not arise under a bankruptcy court's equitable jurisdiction -- for example, claims outside of the context of the equitable claims allowance and disallowance process. *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990) (Seventh Amendment rights waived where party has submitted to equitable claims assessment process and action by Debtor is part of that process, but not where Debtor brings claim at law); *and see Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989). The Third Circuit has made clear that claims of the sort asserted in its Complaint are ones in which a defendant's right to jury trial may not normally be abridged, because such claims are legal in nature, unless a defendant has consented to jurisdiction. *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1245-46 (3d.Cir. 1994). Because Defendant has not consented to the jurisdiction of the Bankruptcy Court with respect to these claims, and they are not within the equitable jurisdiction of the Bankruptcy Court, the reference should be withdrawn to protect Defendant's right to a jury trial.

17.    Other cases specifically support withdrawal of the reference to protect a party's right to a jury trial. *See, e.g. In re Orion Pictures Corporation*, 4 F.3d 1095, 1101 (2d Cir.1993), *cert. denied*, 511 U.S. 928 (1994); *In re Rickel & Associates, Inc.*, 2003 WL 23021972 (S.D.N.Y. 2003); *compare Beard v. Braunstein*, 914 F.2d 434 (3d Cir.1990). As articulated by this Court in *In re NDEP Corp.*, 203 B.R. 905, 908 (Del.Bankr. 1996) (*citing* 28 U.S.C. § 157(e)), "...absent the express consent of both parties and a special designation of jurisdiction by the district court, the bankruptcy court may not hold a jury trial in this non-core proceeding." In this case, Defendant is entitled to a jury trial but does not consent to it being conducted in the Bankruptcy Court. For this reason, cause exists to immediately withdraw the reference of this adversary proceeding.

18.    According to the *Granfinanciera* Court, a three-part test applies to determining whether a claim is legal or equitable in nature (and thus whether a jury trial right would normally attach) and whether a claim at law may, notwithstanding, be subject to non-jury determination:

> [f]irst, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. ... If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder.

*Granfinanciera*, 492 U.S. at 41.

19.    The Third Circuit has held that an action for money damages based on a breach of contract is traditionally a legal claim. *Billing*, 22 F.3d at 1245. In this case, the remedy sought is also legal in nature -- the Plaintiff seeks money damages in the form of payment on the note with interest and attorney fees. *Id.* Thus, it is clear under the *Granfinanciera* standard that this is a claim at law for which Defendant possesses a Seventh Amendment right to a jury. *Id.*

20.    It remains necessary to consider, under the third prong of the *Granfinanciera* test, whether the claims raised in the Complaint may, nevertheless, be assigned to the Bankruptcy Court. *Id.* In so doing, the Third Circuit in *Billing* recognized the distinction drawn by the Supreme Court between "public rights" exercised by the government as a sovereign entity -- but also including rights exercised as part of a regulatory scheme -- which may permit a derogation from jury trial, and purely private rights. *Billing*, 22 F.3d at 1246. It specifically stated, in this regard, that "the right of a debtor to recover contract damages to augment the estate is private". *Id., citing Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71-72 (1982). The *Billing* Court also rejected the proposition that public rights are implicated in every matter involving the administration of a bankruptcy case. *Id.*

**C.    Defendant's Jury Trial Right was not Waived by Filing a Proof of Claim on an Unrelated Matter**

21.    The filing of a proof of claim does not trigger the "public right" identified in *Billing* as to unrelated matters between the same parties. While *Billing* held that matters relating to or affecting the allowance of claims, where the creditor in question had submitted a claim, are traditionally subject to bankruptcy courts' equitable jurisdiction, this holding has limitations. 22 F.3d at 1247; *and see Langenkamp*, 498 U.S. 44-5. *Billing* stated that by filing a claim, such creditor waives any objection to the bankruptcy court's jurisdiction with regard to the litigation of preference avoidance claims against such creditor, since the outcome of such claims inevitably implicates the allowance and value of the creditor's claim against the estate. *Id.* Thus, the *Billing* Court stated that "a creditor who submits a proof of claim against the bankruptcy estate has no right to a jury trial on issues raised *on defense of such a claim*." 22 F.3d at 1250 (emphasis added).

9

22.    The critical element of the *Billing* holding is that, pursuant to Section 502(d), a preference action serves as a defense to a creditor's unsecured claim until the creditor's preference liability is resolved. No such defense is implicated here. Not only does the Complaint assert traditionally private rights to a remedy at law unconnected to Title 11, the institution of this action by the Debtors has no bearing on the claim assessment or adjustment process. Defendant has not submitted to the jurisdiction of the Bankruptcy Court with respect to the claims raised in the Complaint, and those claims are not being raised by the Debtors as defenses to Defendant's claims against the estate. Therefore, there has been no waiver of Defendant's right to a jury trial. *Id.*

23.    To be clear, Defendant has filed a proof of claim with respect to unpaid severance and relocation benefits incident to his employment agreement with the Debtors and has litigated the nature of these obligations in the Bankruptcy Court. The Debtors, however, have taken the position in prior bankruptcy court litigation that the unpaid benefit obligations, if owed, are not owed by Plaintiff, Garden Ridge, L.P., but by a non-party to this Adversary Proceeding, Garden Ridge Management, Inc. Indeed, Debtors have commenced this Adversary Proceeding after receiving a ruling to that effect from the Bankruptcy Court.[2] While Defendant disagrees with that ruling, that ruling governs the parties unless it is reversed or remanded on appeal. As such, a determination as to whether Defendant breached his obligation to repay the Note does not primarily affect the allowability or amount of Defendant's claim. Under the logic of *Granfinanciera* and *Langenkamp*, therefore, there has been no waiver of a jury trial right with respect to the breach of contract alleged in the Complaint.

---

[2] Defendant is currently appealing the Bankruptcy Court's determination that the benefit obligations owed to Defendant were owed by a different Debtor than that to which the Note at issue in this adversary proceeding was issued.

24.    This case, therefore, is entirely dissimilar to an avoidance action under 11 U.S.C. § 547(b), where the result affects both the amount and validity of a creditor's claim. In the case of a preference avoidance action, in addition to the disallowance of claims of an entity that fails to return an avoidable transfer, a creditor is entitled under 11 U.S.C. § 502(h) to a claim against the estate for the amount of any preferential transfer recovered and repaid to the estate. The Plaintiff-Debtor's position before the Bankruptcy Court, however, was that even if Defendant's claim for severance benefits was allowed in full, he would not be permitted to offset such claim to reduce the recovery of the instant Plaintiff on the Note. The converse necessarily follows: under the current record, Plaintiff's success or failure in establishing and enforcing the alleged breach of contract claims against Defendant will have no effect on the validity or allowability of the claims evidenced by Defendant's filed proof of claim.

25.    Therefore, because Defendant is entitled to Seventh Amendment protection with respect to the claims raised in the Complaint, and because the Defendant has not waived those protections with respect to these specific claims, withdrawal of the reference is proper to permit Defendant to exercise his right to a jury trial.

**D.    The Reference Should Be Promptly Withdrawn**

26.    Prompt withdrawal of the reference is appropriate in this case: there is no reason to conduct any further proceedings in the Bankruptcy Court if the District Court will ultimately conduct the trial, and the District Court is capable of handling this matter in its entirety. In this respect, a review of the *NDEP* case is instructive. In *NDEP*, the plaintiff debtor instituted an adversary proceeding alleging breach of contract, and sought the recovery of damages in the approximate amount of $68,000. The defendant demanded a trial by jury and moved to withdraw the reference. After concluding that the defendant was entitled to a trial by jury, this

Court granted the motion, and withdrew the reference of the adversary proceeding. As the Court reasoned:

> "Due to the fact that a District Court Judge must eventually preside over the jury trial in this matter, it would constitute a tremendous waste of judicial resources to permit the bankruptcy judge to continue to maintain jurisdiction over the issues presented in this litigation."

*NDEP*, 203 B.R. at 913 (*quoting Gumport v. Growth Fin. Corp.* (*In re Transcon Lines*), 121 B.R. 837, 838 (C.D. Cal. 1990)).

## WAIVER OF BRIEFING

Pursuant to D. Del. LR 7.1.2, Defendant believes that, given the limited issues raised by this Motion, full briefing is not required. However, Defendant reserves its right to file a reply to the extent necessary to respond to arguments made by Plaintiff in any response to this motion, in accordance with the applicable rules.

WHEREFORE, Defendant respectfully requests that the Court withdraw the reference of this Adversary Proceeding, grant Defendant a jury trial, and grant such other and further relief as the Court deems necessary and proper.

Dated: June 23, 2006
Wilmington, Delaware

**BUCHANAN INGERSOLL PC**

/s/ William D. Sullivan
William D. Sullivan, Esq. (#2820)
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
Tel: (302) 428-5500
Fax: (302) 428-2996

*Counsel for Daniel Ferguson*

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Chapter 11** |
| | : | |
| **GARDEN RIDGE CORPORATION et al.,** | : | **Bankr. Case No.: 04-10324 (KJC)** |
| | : | **Jointly Administered** |
| Debtors. | : | |

| | | |
|---|---|---|
| **GARDEN RIDGE, L.P.,** | : | |
| | : | |
| Plaintiff, | : | **Bankr. Adv. Proc.: 06-50558 (KJC)** |
| | : | |
| v. | : | |
| | : | |
| **DANIEL FERGUSON,** | : | |
| | : | |
| Defendant. | : | |

## ORDER

AND NOW, this _____ day of _____, 2006, upon consideration of the

*Motion Of Daniel Ferguson For Withdrawal Of The Reference To The Bankruptcy Court And*

*Demand For Jury Trial*, and after notice and hearing thereon, and for good cause shown,

IT IS HEREBY

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the reference of this Adversary Proceeding to the United States

Bankruptcy Court for the District of Delaware is hereby withdrawn.

BY THE COURT:

_____
J.

Exhibit F

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GARDEN RIDGE CORPORATION et al., | : | Case No.: 04-10324 (KJC) |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |
| GARDEN RIDGE, L.P., | : | |
| | : | Adv. Proc.: 06-50558 (KJC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DANIEL FERGUSON, | : | |
| | : | |
| Defendant. | : | |

## MOTION OF DANIEL FERGUSON TO DETERMINE CORE OR NON-CORE STATUS

Defendant Daniel Ferguson ("Defendant"), by and through his undersigned counsel, Buchanan Ingersoll PC, hereby files the *Motion of Daniel Ferguson to Determine Core or Non-Core Status* ("Motion"), pursuant to 28 U.S.C. § 157, Federal Rule of Bankruptcy Procedure 5011 and Rule 5011-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, seeking a determination as to whether the Plaintiff's claims fall within the Bankruptcy Court's core jurisdiction, as set forth in 28 U.S.C. § 157(b). Contemporaneously with this Motion, Defendant has filed the *Motion of Daniel Ferguson for Withdrawal of the Reference to the Bankruptcy Court and Demand for Jury Trial* ("Motion to Withdraw the Reference"), requesting that the District Court withdraw the reference to the Bankruptcy Court with respect to this adversary proceeding and asserting Defendant's right to a jury trial. In support of his Motion, Defendant states as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

1.      On or about February 2, 2004, Garden Ridge Corporation and its affiliates, including Plaintiff, Garden Ridge, L.P. ("Plaintiff") and Garden Ridge Management, Inc. (collectively, "Garden Ridge" or "Debtors") filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code ("Code" or "Bankruptcy Code"). Pursuant to 28 U.S.C. § 157(a), the case was automatically referred to the Bankruptcy Court.

2.      On March 7, 2006, Plaintiff initiated an adversary proceeding ("Adversary Proceeding") by filing a complaint ("Complaint"), alleging breaches of contract and seeking recovery on Notes from Defendant issued in favor of Plaintiff. In the Complaint, Plaintiff asserts that the Adversary Proceeding falls within the Bankruptcy Court's core jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(C) and (O).

3.      On April 6, 2006, Defendant filed an Answer to the Complaint in which he denied that the Bankruptcy Court has core jurisdiction over this adversary proceeding, stated that he does not consent to the entry of a final order or judgment in this matter by the Bankruptcy Court, and included a prayer for trial by jury.

4.      Contemporaneously with this Motion, Defendant filed his Motion to Withdraw the Reference, asserting that the instant case is a non-core matter as to which permissive withdrawal of the reference under 28 U.S.C. § 157(d) is appropriate, and that Defendant is entitled to a jury trial before the District Court.

## RELIEF REQUESTED

5.      By this Motion, Defendant requests a determination that the matters alleged in the Complaint are not within the Bankruptcy Court's core jurisdiction, as set forth in 28 U.S.C. § 157(b).

2

### BASIS FOR RELIEF

6.      The matters alleged in the Complaint are not within the Court's core jurisdiction because the Complaint, on its face, is a simple breach of contract and collection action unrelated to Title 11 and as to which these Debtors' bankruptcy cases are functionally irrelevant.  Under the standards articulated by the Third Circuit Court of Appeals, the claims stated in the Complaint are *per se* non-core because they invoke no substantive right created by Title 11, United States Code (the "Bankruptcy Code"), and -- because they are breach of contract claims based on alleged pre-petition obligations -- are not claims that could arise only in the context of the Plaintiff's bankruptcy case.

7.      The Third Circuit has explained that "proceedings 'arising under' title 11 or 'arising in' title 11 cases are 'core.'  By contrast, proceedings which are 'related to' a bankruptcy case are non-core."  *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1234 -1235 (3d Cir. 1994) (citations omitted).  In *In re Mintze*, 434 F.3d 222, 228 – 29 (3d Cir. 2006), the Third Circuit explained the practical difference between core and non-core proceedings:

> Bankruptcy proceedings are divided into two categories: core and non-core.  *See* 28 U.S.C. § 157.  The distinction between the two categories is relevant because the type of proceeding may determine the ultimate authority of the bankruptcy court.  In a core proceeding, a bankruptcy court has "comprehensive power to hear, decide and enter final orders and judgments."  [*Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999)] (citing 28 U.S.C. § 157(b)(1)).  In addition, the bankruptcy court can make findings of fact and conclusions of law.  In contrast, the bankruptcy court's authority is significantly limited in non-core proceedings.  In a non-core proceeding, the bankruptcy court is allowed only to make proposed findings of fact and proposed conclusions of law, which it submits to the district court.  *See* 28 U.S.C. § 157(c)(1).

*Mintze*, 434 F.3d at 228-9.

8.      Under *Halper*, the determination of core or non-core status requires the Bankruptcy Court to first assess claims against the illustrative categories of 28 U.S.C. § 157(b)(2).  *Id.*  Even if the claims at issue appear to fit within the illustrative categories,

however, it must be shown that each claim falling within such a category either invokes a substantive right provided by the Bankruptcy Code, or is a proceeding that, by its nature, could only arise in the context of a bankruptcy case. *Halper,* 164 F.3d at 836; *In re G-I Holdings, Inc.,* 278 B.R. 376, 382 (Bankr.D.N.J., 2002). Claims that do not invoke such a right or that could have been raised outside of the bankruptcy case are non-core. *Id.* Each claim in a complaint should be examined individually to determine whether each is core or non-core in nature. *Halper,* 164 F.3d at 836.

9.  Notably, the Third Circuit's test for whether a matter is core or non-core is narrower than those applied in other jurisdictions, and bankruptcy courts may not find a matter to be a core proceeding based only on a comparison with the illustrative categories in Section 158(b)(2). *In re G-I Holdings, Inc.,* 278 B.R. 376, 381-2 (Bankr.D.N.J., 2002). Rather, the court must make a specific finding that a Title 11 right is being invoked or that the proceeding could only arise in the context of a bankruptcy case. *Id.* Indeed, the Third Circuit has specifically stated that the allegation that a breach of contract action will bring money into the bankruptcy estate is *not* a basis for a finding that such a claim is core. *Phar-Mor,* 22 F.3d 1228 at n. 19.

10.  Plaintiff asserts that these matters are core pursuant to Section 158(b)(2)(C) (counterclaims against a party making a claim in the bankruptcy case) and (O) (matters affecting liquidation of the assets of the estate). 28 U.S.C. § 157(b)(2). Subsection (C) is inapplicable on its face: Plaintiff has consistently taken the position during litigation relating to Defendant's claims in these Debtors' bankruptcy cases that Defendant *has no claim against Plaintiff. See gen. Objection to Motion of Daniel Ferguson for Relief from Stay Under Section 362(d)(1) of the Bankruptcy Code to the Extent Necessary to Set Off Mutual Debts,* Case No. 04-10423, U.S. Bankruptcy Court for the District of Delaware, Docket No. 1725. To be clear, Defendant has

asserted a claim for severance benefits in the bankruptcy case against the Plaintiff, but Plaintiff asserted in the bankruptcy case that Defendant's claim for severance benefits is assertable only against Garden Ridge Management, an affiliate of the Plaintiff, but not against the Plaintiff. The bankruptcy court ruled in favor of the Plaintiff on that issue, and while Defendant has appealed that ruling, Defendant is presently unable to assert its claim against Garden Ridge, L.P., the Plaintiff herein. Plaintiff is therefore estopped from claiming that an action against Defendant is by way of a counterclaim relating to his claims in the main bankruptcy case since, according to Plaintiff, Defendant has no claim against it.

11.    Regardless of the whether Plaintiff's claims can be shoehorned into the illustrative categories of Section 157(b)(2), its claims are still non-core because they fail the second part of the Third Circuit's test for determining core status. *G-I Holdings, Inc.*, 278 B.R. at 381-2. The matters raised in the Complaint are non-core because none of the claims invoke a substantive right provided by the bankruptcy code and the proceeding is one that could arise outside of the context of a bankruptcy case. *Id.*

12.    Specifically, the Complaint states causes of action for breach of contract in three counts as to three Notes issued by Defendant in favor of Plaintiff, under which payments are alleged to be due, and seeks attorney fees and costs by a separate count. Complaint, 5-6. Thus, the Complaint is nothing more than a state law breach of contract action based on a pre-petition contract, for which Debtors seek money damages. Debtors' alleged rights under the Notes received from Defendant do not arise from the bankruptcy code, but from the common law of contract in the state of Texas, where they were made.

13.    Nor are they actions that could only arise in the context of a bankruptcy case: the Debtors could have brought such an action in any appropriate forum regardless of the filing of

their bankruptcy, and the breaches alleged are not factually dependent on the existence of a

bankruptcy case, nor do they deal with matters central or integral to these cases. *Id.*

14.    The Third Circuit Court of Appeals has held that breach of contract claims arising

from pre-petition contracts are treated as non-core matters. *Beard v. Braunstein*, 914 F.2d 434,

443 (3d.Cir. 1990) ("It is clear that to the extent that the claim is for pre-petition contract

damages, it is non-core"); *see Northern Pipe Line Construction Co. v. Marathon Pipeline Co.*,

458 U.S. 50, 89-90 (1982); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 93 (1989),

Blackmun, J., *dissenting* ("Congress, for example, could not designate as "core bankruptcy

proceedings" state-law contract actions brought by debtors against third parties.").

15.    Treatment of a breach of contract claim as a core matter is typically encountered

only in the context of a post-petition contract between a defendant and a debtor, where the

defendant typically has notice they are dealing with a debtor-in-possession and where the

debtors' right of action, although not created by Title 11, is integral to the administration of the

estate. *See gen. In re Agri-Concrete Products, Inc.*, 153 B.R. 673 (Bankr.M.D.Pa. 1993); *c.f.

Phar-Mor*, 22 F.3d 1228 at n. 19. None of the Notes alleged in the Complaint are post-petition

contracts. Even if they were, the Notes in question are in no way crucial or integral to the

administration of the estate. *Id.*

16.    None of the claims raised in the complaint are core matters. It is also unclear

whether, given the pre-petition nature of the Notes at issue and the post-confirmation status of

these Debtors, the Bankruptcy Court even has related-to jurisdiction over the causes of action as

alleged in the Complaint. Even if the Bankruptcy Court has related-to jurisdiction, Defendant

has not consented to the exercise of such jurisdiction by the bankruptcy court with respect to the

entry of a final order or judgment. Indeed, in the Answer and Motion to Withdraw the

Reference, Defendant has sought to enforce his jury trial right and has sought removal of this action to the District Court.

WHEREFORE, Defendant Daniel Ferguson respectfully requests that the Court enter an Order determining that all claims in the Plaintiff's Complaint are non-core in nature and granting such further and other relief as justice shall require.

Dated: June 23, 2006
Wilmington, Delaware

**BUCHANAN INGERSOLL PC**

/s/ William D. Sullivan
William D. Sullivan, Esq. (#2820)
1007 North Orange Street, Suite 1110
Wilmington, DE 19801
Tel: (302) 428-5500
Fax: (302) 428-2996

*Counsel for Daniel Ferguson*

7

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:                                          :
                                                :         **Chapter 11**
                                                :
**GARDEN RIDGE CORPORATION et al.,**             :         **Case No.: 04-10324 (KJC)**
                                                :         **Jointly Administered**
                    **Debtors.**                 :
—————————————————————————:
                                                :
**GARDEN RIDGE, L.P.,**                          :
                                                :         **Adv. Proc.: 06-50558 (KJC)**
                    **Plaintiff,**               :
                                                :
         **v.**                                  :
                                                :
**DANIEL FERGUSON,**                             :
                                                :
                    **Defendant.**               :
—————————————————————————:

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2006, upon consideration of the

*Motion of Daniel Ferguson to Determine Core or Non-Core Status*, and after notice and hearing

thereon, and for good cause shown, and

WHEREAS, the *Complaint* alleges three counts for breach of contract and one count for

attorney fees and costs based on said breach; and

WHEREAS, the causes of action stated in the *Complaint* relate to pre-petition contracts

unrelated to the administration of Plaintiff's bankruptcy case; and

WHEREAS, the *Complaint* does not invoke substantive rights created by Title 11, United

States Code; and

WHEREAS, the causes of action stated in the *Complaint* are not claims which could only

arise in the context of a bankruptcy case;  IT IS HEREBY

ORDERED that the Motion is GRANTED; and it is further

ORDERED that all of the claims stated in the *Complaint* are "non-core" claims, outside of the core jurisdiction of this Court, pursuant to 28 U.S.C. § 157(b).

BY THE COURT:

_____
HONORABLE KEVIN J CAREY
UNITED STATES BANKRUPTCY JUDGE

Exhibit G

$250,000.00                    Houston, Texas                    March 8, 2001

    FOR VALUE RECEIVED, DAN FERGUSON, ("Maker") promises to pay to the order of GARDEN RIDGE, L.P. ("Payee"), at 19411 Atrium Place, Suite 170, Houston, Harris County, Texas 77084, or at such other place as the holder of this note may hereafter designate in writing, in immediately available funds and in lawful money of the United States of America, the principal sum of TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00). Interest shall accrue on such obligation at [5.75%], per annum. Interest on this obligation shall be computed for the actual number of days elapsed in a year consisting of 365 or 366 days, as the case may be.

    The principal of this note and all accrued and unpaid interest on the principal of this note shall be due and payable on the earlier of (i) thirty (30) days after the closing of the sale of all or any portion of Maker's interest in the real property or improvements thereon located at 3510 Vineyard Hill Drive in Rochester, Michigan; (ii) the date of the termination of Maker's employment with Payee or any of Payee's affiliates for any reason or no reason, regardless of whether such termination occurs by action of Maker or Payee; or (iii) December 31,2001, the earlier of such dates being the final maturity of this note.

    Maker may at any time pay the full amount or any part of this note without payment of any premium or fee. All prepayments shall be applied first to accrued interest, the balance to principal.

    Maker's failure to pay any principal or accrued interest owing on this note when due or the occurrence of any default under any writing related to this note shall constitute default under this note, whereupon the holder of this note may elect to exercise any or all rights, powers and remedies afforded (a) under all writings related to this note and (b) by law, including the right to accelerate the maturity of this entire note.

    If any holder of this note retains an attorney in connection with any such default or to collect, enforce or defend this note or any papers intended to secure or guarantee it in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Maker sues any holder in connection with this note or any such papers and does not prevail, then Maker agrees to pay to each such holder, in addition to principal and interest, all reasonable costs and expenses incurred by such holder in trying to collect this note or in any such suit or proceeding, including reasonable attorneys' fees. An amount equal to ten percent (10%) of the unpaid principal and accrued interest owing on this note when and if this note is placed in the hands of an attorney for collection after default is stipulated to be reasonable attorneys' fees unless a holder or any maker of this note timely pleads otherwise to a court of competent jurisdiction.

    Maker and any and all co-makers, endorsers, guarantors and sureties severally waive notice (including, but not limited to, notice of intent to accelerate and notice of acceleration,

INITIALLED FOR
INDENTIFICATION

GR474

p.14          281-646-0818          Garden Ridge - Corp. HR          Sep 30 03 10:10a

A006

notice of protest and notice of dishonor), demand, presentment for payment, protest, diligence in collecting and the filing of suit for the purpose of fixing liability and consent that the time of payment hereof may be extended and re-extended from time to time without notice to any of them. Each such person agrees that his, her or its liability on or with respect to this note shall not be affected by any release of or change in any guaranty or security at any time existing or by any failure to perfect or maintain perfection of any lien against or security interest in any such security or the partial or complete unenforceability of any guaranty or other surety obligation, in each case in whole or in part, with or without notice and before or after maturity.

Notwithstanding any provision to the contrary contained in this note or any other writing relating to this note, it is expressly provided that in no case or event shall the aggregate of (i) all interest on the unpaid balance of this note, accrued or paid from the date hereof and (ii) the aggregate of any other amounts accrued or paid pursuant to this note or any other writing relating to this note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this note from the date hereof, ever exceed the Ceiling Rate (as hereinafter defined). In this connection, Maker and Payee stipulate and agree that it is their common and overriding intent to contract in strict compliance with applicable usury laws. In furtherance thereof, none of the terms of this note or any other writing relating to this note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Ceiling Rate. Maker or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this note shall never be liable for interest in excess of the Ceiling Rate. If, for any reason whatever, the interest paid or received on this note during its full term produces a rate which exceeds the Ceiling Rate, the holder of this note shall credit against the principal of this note (or, if such indebtedness shall have been paid in full, shall refund to the payor of such interest) such portion of said interest as shall be necessary to cause the interest paid on this note to produce a rate equal to the Ceiling Rate. All sums paid or agreed to be paid to the holder of this note for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this note, so that the interest rate is uniform throughout the full term of this note. The provisions of this paragraph shall control all agreements, whether now or hereafter existing and whether written or oral, between Maker and Payee. As used herein, the term "Ceiling Rate" means, on any day, the maximum nonusurious rate of interest permitted for that day by whichever of applicable federal or Texas laws permits the higher interest rate, stated as a rate per annum. On each day, if any, that applicable Texas law establishes the Ceiling Rate, the Ceiling Rate shall be the "weekly ceiling" (as defined in §303 of the Texas Finance Code — the "Texas Finance Code" — and Chapter 1D of Title 79, Texas Rev. Civ. Stats. 1925 — "Chapter 1D", as amended, respectively) for that day. Payee may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code or Chapter 1D by notice to Maker if and to the extent permitted by the Texas Finance Code or Chapter 1D. Without notice to Maker or any other person or entity, the Ceiling Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates. Maker warrants and represents to Payee and all other holders of this note that all loans evidenced by this note are and will be for business, commercial, investment or other similar purpose and not primarily for personal, family, household or agricultural use, as such terms are used in Chapter 1D or the Texas Finance Code.

INITIALLED FOR
INDETIFICATION

HOUSTON 01401500000 4723970

GR475

p.15    8180-949-182    Garden Ridge - Corp. HR    811:01 80 08 pas

A007

This note shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America from time to time in effect. Harris County, Texas shall be a proper place of venue for suit hereon. Maker and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceedings in respect of this note or any loan agreement, security agreement, guaranty or other writing relating hereto shall be brought in the district courts of Harris County, Texas, or the United States District Court for the Southern District of Texas, Houston Division.

MAKER

DAN FERGUSON

INITIALLED FOR
INDETIFICATION

GR476

A008

Exhibit H

$250,000.00                    Houston, Texas                    January 1, 2002

FOR VALUE RECEIVED, DAN FERGUSON, ("Maker") promises to pay to the order of GARDEN RIDGE, L.P. ("Payee"), at 19411 Atrium Place, Suite 170, Houston, Harris County, Texas 77084, or at such other place as the holder of this note may hereafter designate in writing, in immediately available funds and in lawful money of the United States of America, the principal sum of NINETY THOUSAND AND NO/100 DOLLARS ($250,000.00). Interest shall accrue on such obligation at [X.75%], per annum. Interest on this obligation shall be computed for the actual number of days elapsed in a year consisting of 365 or 366 days, as the case may be.

The principal of this note and all accrued and unpaid interest on the principal of this note shall be due and payable on the earlier of (i) thirty (30) days after the closing of the sale of all or any portion of Maker's interest in the real property or improvements thereon located at 3510 Vineyard Hill Drive in Rochester, Michigan; (ii) the date of the termination of Maker's employment with Payee or any of Payee's affiliates for any reason or no reason, regardless of whether such termination occurs by action of Maker or Payee; or (iii) December 31,2002, the earlier of such dates being the final maturity of this note.

Maker may at any time pay the full amount or any part of this note without payment of any premium or fee. All prepayments shall be applied first to accrued interest, the balance to principal.

Maker's failure to pay any principal or accrued interest owing on this note when due or the occurrence of any default under any writing related to this note shall constitute default under this note, whereupon the holder of this note may elect to exercise any or all rights, powers and remedies afforded (a) under all writings related to this note and (b) by law, including the right to accelerate the maturity of this entire note.

If any holder of this note retains an attorney in connection with any such default or to collect, enforce or defend this note or any papers intended to secure or guarantee it in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Maker sues any holder in connection with this note or any such papers and does not prevail, then Maker agrees to pay to each such holder, in addition to principal and interest, all reasonable costs and expenses incurred by such holder in trying to collect this note or in any such suit or proceeding, including reasonable attorneys' fees. An amount equal to ten percent (10%) of the unpaid principal and accrued interest owing on this note when and if this note is placed in the hands of an attorney for collection after default is stipulated to be reasonable attorneys' fees unless a holder or any maker of this note timely pleads otherwise to a court of competent jurisdiction.

Maker and any and all co-makers, endorsers, guarantors and sureties severally waive notice (including, but not limited to, notice of intent to accelerate and notice of acceleration, notice of protest and notice of dishonor), demand, presentment for payment, protest, diligence in

INITIALLED FOR
INDETIFICATION

collecting and the filing of suit for the purpose of fixing liability and consent that the time of payment hereof may be extended and re-extended from time to time without notice to any of them. Each such person agrees that his, her or its liability on or with respect to this note shall not be affected by any release of or change in any guaranty or security at any time existing or by any failure to perfect or maintain perfection of any lien against or security interest in any such security or the partial or complete unenforceability of any guaranty or other surety obligation, in each case in whole or in part, with or without notice and before or after maturity.

Notwithstanding any provision to the contrary contained in this note or any other writing relating to this note, it is expressly provided that in no case or event shall the aggregate of (i) all interest on the unpaid balance of this note, accrued or paid from the date hereof and (ii) the aggregate of any other amounts accrued or paid pursuant to this note or any other writing relating to this note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this note from the date hereof, ever exceed the Ceiling Rate (as hereinafter defined). In this connection, Maker and Payee stipulate and agree that it is their common and overriding intent to contract in strict compliance with applicable usury laws. In furtherance thereof, none of the terms of this note or any other writing relating to this note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Ceiling Rate. Maker or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this note shall never be liable for interest in excess of the Ceiling Rate. If, for any reason whatever, the interest paid or received on this note during its full term produces a rate which exceeds the Ceiling Rate, the holder of this note shall credit against the principal of this note (or, if such indebtedness shall have been paid in full, shall refund to the payor of such interest) such portion of said interest as shall be necessary to cause the interest paid on this note to produce a rate equal to the Ceiling Rate. All sums paid or agreed to be paid to the holder of this note for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this note, so that the interest rate is uniform throughout the full term of this note. The provisions of this paragraph shall control all agreements, whether now or hereafter existing and whether written or oral, between Maker and Payee. As used herein, the term "Ceiling Rate" means, on any day, the maximum nonusurious rate of interest permitted for that day by whichever of applicable federal or Texas laws permits the higher interest rate, stated as a rate per annum. On each day, if any, that applicable Texas law establishes the Ceiling Rate, the Ceiling Rate shall be the "weekly ceiling" (as defined in §303 of the Texas Finance Code — the *Texas Finance Code*" — and Chapter 1D of Title 79, Texas Rev. Civ. Stats. 1925 — "*Chapter 1D*", as amended, respectively) for that day. Payee may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code or Chapter 1D by notice to Maker if and to the extent permitted by the Texas Finance Code or Chapter 1D. Without notice to Maker or any other person or entity, the Ceiling Rate shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates. Maker warrants and represents to Payee and all other holders of this note that all loans evidenced by this note are and will be for business, commercial, investment or other similar purpose and not primarily for personal, family, household or agricultural use, as such terms are used in Chapter 1D or the Texas Finance Code.

INITIALLED FOR
INDETIFICATION

This note shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America from time to time in effect. Harris County, Texas shall be a proper place of venue for suit hereon. Maker and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceedings in respect of this note or any loan agreement, security agreement, guaranty or other writing relating hereto shall be brought in the district courts of Harris County, Texas, or the United States District Court for the Southern District of Texas, Houston Division.

MAKER

DAN FERGUSON

INITIALLED FOR
INDETIFICATION

GR471

Exhibit I

$250,000.00          Houston, Texas          January 1, 2003

FOR VALUE RECEIVED, DAN FERGUSON, ("Maker") promises to pay to the order of GARDEN RIDGE, L.P. ("Payee"), at 19411 Atrium Place, Suite 170, Houston, Harris County, Texas 77084, or at such other place as the holder of this note may hereafter designate in writing, in immediately available funds and in lawful money of the United States of America, the principal sum of TWO HUNDRED FIFTY THOUSAND AND NO/100($250,000.00). Interest shall accrue on such obligation at [2.75%], per annum. Interest on this obligation shall be computed for the actual number of days elapsed in a year consisting of 365 or 366 days, as the case may be.

The principal of this note and all accrued and unpaid interest on the principal of this note shall be due and payable on the earlier of (i) thirty (30) days after the closing of the sale of all or any portion of Maker's interest in the real property or improvements thereon located at 3510 Vineyard Hill Drive in Rochester, Michigan; (ii) the date of the termination of Maker's employment with Payee or any of Payee's affiliates for any reason or no reason, regardless of whether such termination occurs by action of Maker or Payee; or (iii) December 31,2003, the earlier of such dates being the final maturity of this note.

Maker may at any time pay the full amount or any part of this note without payment of any premium or fee. All prepayments shall be applied first to accrued interest, the balance to principal.

Maker's failure to pay any principal or accrued interest owing on this note when due or the occurrence of any default under any writing related to this note shall constitute default under this note, whereupon the holder of this note may elect to exercise any or all rights, powers and remedies afforded (a) under all writings related to this note and (b) by law, including the right to accelerate the maturity of this entire note.

If any holder of this note retains an attorney in connection with any such default or to collect, enforce or defend this note or any papers intended to secure or guarantee it in any lawsuit or in any probate, reorganization, bankruptcy or other proceeding, or if Maker sues any holder in connection with this note or any such papers and does not prevail, then Maker agrees to pay to each such holder, in addition to principal and interest, all reasonable costs and expenses incurred by such holder in trying to collect this note or in any such suit or proceeding, including reasonable attorneys' fees. An amount equal to ten percent (10%) of the unpaid principal and accrued interest owing on this note when and if this note is placed in the hands of an attorney for collection after default is stipulated to be reasonable attorneys' fees unless a holder or any maker of this note timely pleads otherwise to a court of competent jurisdiction.

Maker and any and all co-makers, endorsers, guarantors and sureties severally waive notice (including, but not limited to, notice of intent to accelerate and notice of acceleration,

INITIALLED FOR
INDETIFICATION

HOUSTON 01401S\00000 477397\3

Page 1 of 3 Pages

GR466

notice of protest and notice of dishonor), demand, presentment for payment, protest, diligence in collecting and the filing of suit for the purpose of fixing liability and consent that the time of payment hereof may be extended and re-extended from time to time without notice to any of them. Each such person agrees that his, her or its liability on or with respect to this note shall not be affected by any release of or change in any guaranty or security at any time existing or by any failure to perfect or maintain perfection of any lien against or security interest in any such security or the partial or complete unenforceability of any guaranty or other surety obligation, in each case in whole or in part, with or without notice and before or after maturity.

Notwithstanding any provision to the contrary contained in this note or any other writing relating to this note, it is expressly provided that in no case or event shall the aggregate of (i) all interest on the unpaid balance of this note, accrued or paid from the date hereof and (ii) the aggregate of any other amounts accrued or paid pursuant to this note or any other writing relating to this note, which under applicable laws are or may be deemed to constitute interest upon the indebtedness evidenced by this note from the date hereof, ever exceed the Ceiling Rate (as hereinafter defined). In this connection, Maker and Payee stipulate and agree that it is their common and overriding intent to contract in strict compliance with applicable usury laws. In furtherance thereof, none of the terms of this note or any other writing relating to this note shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Ceiling Rate. Maker or other parties now or hereafter becoming liable for payment of the indebtedness evidenced by this note shall never be liable for interest in excess of the Ceiling Rate. If, for any reason whatever, the interest paid or received on this note during its full term produces a rate which exceeds the Ceiling Rate, the holder of this note shall credit against the principal of this note (or, if such indebtedness shall have been paid in full, shall refund to the payor of such interest) such portion of said interest as shall be necessary to cause the interest paid on this note to produce a rate equal to the Ceiling Rate. All sums paid or agreed to be paid to the holder of this note for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this note, so that the interest rate is uniform throughout the full term of this note. The provisions of this paragraph shall control all agreements, whether now or hereafter existing and whether written or oral, between Maker and Payee. As used herein, the term "Ceiling Rate" means, on any day, the maximum nonusurious rate of interest permitted for that day by whichever of applicable federal or Texas laws permits the higher interest rate, stated as a rate per annum. On each day, if any, that applicable Texas law establishes the Ceiling Rate, the Ceiling Rate shall be the "weekly ceiling" (as defined in §303 of the Texas Finance Code — the "Texas Finance Code" — and Chapter 1D of Title 79, Texas Rev. Civ. Stats. 1925 — "Chapter 1D", as amended, respectively) for that day. Payee may from time to time, as to current and future balances, implement any other ceiling under the Texas Finance Code or Chapter 1D by notice to Maker if and to the extent permitted by the Texas Finance Code or Chapter 1D. Without notice to Maker or any other person or entity, the Ceiling Rate shall automatically fluctuate upward and downward and as in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates. Maker warrants and represents to Payee and all other holders of this note that all loans evidenced by this note are and will be for business, commercial, investment or other similar purpose and not primarily for personal, family, household or agricultural use, as such terms are used in Chapter 1D or the Texas Finance Code.

INITIALLED FOR
INDETIFICATION

HOUSTON 01491500000 4775970.3

Page 2 of 3 Pages

GR467

This note shall be governed by and construed in accordance with the laws of the State of Texas and the United States of America from time to time in effect. Harris County, Texas shall be a proper place of venue for suit hereon. Maker and any and all co-makers, endorsers, guarantors and sureties irrevocably agree that any legal proceedings in respect of this note or any loan agreement, security agreement, guaranty or other writing relating hereto shall be brought in the district courts of Harris County, Texas, or the United States District Court for the Southern District of Texas, Houston Division.

MAKER

DAN FERGUSON

GR468

INITIALLED FOR
INDETIFICATION

HOUSTON 014015/00000 477297v3

281-646-0818   Garden Ridge - Corp. HR   Sep 30 03 10:07a

p.8

A011

Exhibit J

04/12/04  14:11  FAX 1 501 851 1234          HERRING & ASSOC.                                    ☑02

B10 (Official)

| ...... of Delaware | PROOF OF CLAIM |
|---|---|
| In re: **Garden Ridge, Corp.** | Case Number: **04-10324** |

NOTE: This claim sh old not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Creditor Name (Person or entity to whom the debtor owes) | Daniel Ferguson | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach Copy of statement giving particulars. |
|---|---|---|
| Address Line 1 | c/o William D. Sullivan, Esq. | ☐ Check box if you have never received any notices from the bankruptcy court in this case. |
| Address Line 2 | 400 Delaware Ave, Suite 1700 | |
| Address Line 3 | P.O. Box 1630 | ☐ Check box if the address differs from the address on the envelope sent to you by the court |
| City, ST ZIP | Wilmington, DE 19899-1630 | THIS SPACE IS FOR COURT USE ONLY |

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

Check here if this claim  ☐ replaces  ☐ amends  a previously filed claim dated:

**1. BASIS FOR CLAIM**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other (Describe briefly): **Breach of Contract**
- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (Fill out below)
  Your social security No._____
  Unpaid compensation for service performed from _____ (date) to _____ (date)

**2. Date Debt Incurred (MM/DD/YY)**

**3. If Court Judgment, Date Obtained:**

**4. CLASSIFICATION OF CLAIM.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ **SECURED CLAIM**
Attach evidence of perfection of security interest
Brief Description of Collateral:
- ☐ Real Estate
- ☐ Motor Vehicle
- ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any:

☒ **UNSECURED NONPRIORITY CLAIM**
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ **UNSECURED PRIORITY CLAIM** - Specify the priority of the claim.
- ☐ Wages, salaries, or commissions (up to $4,300), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3)
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4)
- ☐ Up to $1,950 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Taxes or penalties of governmental units - 11 U.S.C. § 507 (a)(7)
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

**5. AMOUNT OF CLAIM AT TIME CASE FILED:**

| (Secured) | $ 3 1 0 0 0 0 0 0 (Unsecured Nonpriority) | (Unsecured Priority) |
|---|---|---|

☐ Check this box if claim includes charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

**6. CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**7. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.    **See summary**

**8. TIME-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
APR 16 2004
THE ALTMAN GROUP, INC.

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|
| 4/12/04 | Daniel Ferguson _(signature)_ |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both, 18 U.S.C. §§ 152 and 3571.

A019

## SUMMARY OF THE PROOF OF CLAIM OF DANIEL FERGUSON

Daniel Ferguson files this proof of claim based on the breach of a written contract of employment (the "Contract") existing between Mr. Ferguson and Garden Ridge. The Contract provides for the payment of one year of base salary, $250,000.00, if Mr. Ferguson is terminated without cause. Mr. Ferguson was terminated without cause. Garden Ridge has failed to make any severance payments as required under the contract, attached as Exhibit A.

The Contract further provides for the payment of relocation costs, including real estate commissions, under the Contract's relocation provision. Garden Ridge has failed to pay relocation costs as provided. The amount owed is approximately $60,000.00.

These claims are the subject of a lawsuit pending in Harris County, TX, attached as Exhibit B.

These claims are also subject to a setoff of $250,000.00 owed to Garden Ridge pursuant to a promissory note dated January 1, 2003.

# EXHIBIT A

# Garden Ridge®

## THE HOME DECOR & CRAFT MARKETPLACE

January 26, 2001

Dear Dan,

It is with great pleasure that I extend to you our offer to join Garden Ridge's Executive Committee as **Senior Vice President -- Supply Chain.** You will report directly to Richard Nawrot, EVP -- Information Technology & Logistics. We have a tremendous personal and financial opportunity for you here at Garden Ridge and feel that you will make an excellent addition to our management team.

The details of your offer include:

**SALARY**
- Your initial base salary will be $240,000 per year, payable bi-weekly. Your first consideration for salary review will take place in March 2002.

**Bonus**
- You will be eligible for our FY 2002 (2/1/01 -- 1/31/02) bonus plan.
- You will be eligible to earn a **bonus target of 50% on your base salary** based on the total company meeting its financial plans. If we exceed plan, the **bonus is uncapped and you could make up to 100% of your base salary.** Bonus payments normally occur in April of each year.

**Stock Options**
- Upon hire, we will recommend that the Stock Option Committee of the Board of Directors grant you a **stock option of 25,000 shares of Garden Ridge Stock.** One-third of these shares vest after one year of employment and the remaining two-thirds vest evenly on the second and third anniversary of your initial grant, with ten years being the life of the plan. The stock option strike price will be set no later than our June Board Meeting. However, your vesting will commence on the first of the month following your date of hire.
- Since we are private, our stock will be valued annually. The valuation will approximate the public price of the stock as if it were on the open market.
- Three unique features of our stock plan that differentiate us are:
  1. Stock can be sold at any time. **No blackout periods.**
  2. Employee sales of stock are offered to other plan participants first. That is, **you can buy more stock than granted** if others sell their shares. The company will buy back shares not acquired by employees not to exceed 3% annually.
  3. If we meet our financial plans the options have an **acceleration of vesting** change. The options vest 6 months earlier for meeting plan. If we meet plan 2 years in a row, all options are vested in 2 years versus the 3 years as granted.

## RELOCATION

- Garden Ridge will arrange for and cover the costs of the packing and transporting and reasonable storage time, if necessary, of your household goods.
- We will **cover closing costs**, including customary real estate commissions up to **6% maximum** on the sale of your existing home. We will also **cover closing costs on the purchase of your new home**; however, hazard insurance, deposits and other prepaid expenses associated with the sale of your existing home and the purchase of your new home are excluded. (Policy details attached)
- If necessary, you will also be provided with **interim living assistance for up to 90 days**.
- Garden Ridge will **cover travel expenses** incurred for the relocation to Houston prior to the moving of household goods, and will allow up to two weekend trips, with airfare, motel and rental car expenses covered to search for permanent housing.
- Garden Ridge will **gross up applicable non-deductible relocation expenses**.

## VACATION

- You will be eligible for **3 weeks of vacation** your first year.

## HEALTH INSURANCE

- You, and your eligible dependents will be **eligible to participate in Garden Ridge's Group Health Plan** (including basic term life insurance) **after 90 days of service.** Coverage will not begin until Corporate Benefits and Compensation receives the appropriate completed enrollment forms.

## EXECUTIVE BENEFITS

- You will also be eligible for a **supplemental executive medical plan that covers up to $10,000 annually**. It will cover expenses that are not generally covered in the basic plan, such as co-pays, eyeglasses, etc.
- You will have the **opportunity to purchase additional executive life insurance** beyond the basic plan.

## OTHER BENEFITS

- Dental Insurance
- Vision Insurance
- 401K Plan (After eligibility requirements are met)

- Long Term Disability
- Short Term Disability
- Paid Holidays
- Associate Discount

## SEVERENCE

- If released without cause, you will receive one year of base salary.

**PLEASE NOTE**
- In accordance with company policy, an officer who voluntarily terminates employment with the company for any reason within 24 months of the date of employment or transfer will be required to repay to the company within 30 days following such termination, the costs associated with relocation.

This is an exciting time in our business. You would be "coming in on the ground floor". We are certain you will find that Garden Ridge will live up to your expectations and provide a rewarding and challenging step in your career.

Sincerely,

Paul T. Davies
President & Chief Executive Officer

Richard Nawrot
EVP – Information Technology &
Logistics

[Please indicate your agreement to the above by signing and dating below and returning this to me via fax at (281) 646-0818 or by mail at 19411 Atrium Place, Suite 170, Houston, Texas 77084. Contact me at (281) 579-7901 ext. 204 confidentially prior to sending a fax.]

**AGREED AND ACCEPTED:**

Name

1/28/01

Date

# EXHIBIT B

NO. 2003-32259

| | | |
|---|---|---|
| ROBERT RANDALL ONSTEAD, JR.<br>AND REBECCA NASH | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| VS. | §<br>§ | HARRIS COUNTY, T E X A S |
| GARDEN RIDGE MANAGEMENT, INC.<br>AND GARDEN RIDGE, L.P. | §<br>§ | 189th   JUDICIAL   DISTRICT |

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES ROBERT RANDALL ONSTEAD, JR., REBECCA NASH and DANIEL

FERGUSON hereinafter referred to as Plaintiffs, complaining of GARDEN RIDGE

MANAGEMENT, INC. and GARDEN RIDGE, L.P., hereinafter referred to as Defendants, and for

cause of action would respectfully show unto the Court as follows:

I.

Plaintiff ROBERT RANDALL ONSTEAD, JR. is an individual residing in Houston, Harris

County, Texas.

Plaintiff REBECCA NASH is an individual residing in Fredericksburg, Gillespie County,

Texas.

Plaintiff DANIEL FERGUSON is an individual residing in Katy, Harris County, Texas.

Defendants GARDEN RIDGE MANAGEMENT, INC. and GARDEN RIDGE, L.P. have

been served with process and have filed answers herein.

Discovery should be conducted in accordance with a discovery control plan under Civil

Procedure Rule 190.3.

A026

## II.

Venue is proper in this Court pursuant to the Texas Civil Practices and Remedies Code, Section 15.001, in that the entire cause of action accrued in Harris County, Texas.

## III.

On the 17th day of October 2003, Plaintiff ROBERT RANDALL ONSTEAD, JR. was formerly offered the position of CEO of Defendants herein and a seat on the Board of Directors. The official offer included a salary of $475,000.00 per year, a signing bonus of $100,000.00 and a termination provision that provides for one year's salary, if terminated other than for cause. This formal offer was accepted and work was commenced pursuant thereto and Plaintiff herein commenced work in October 2002. Plaintiff was terminated without cause in April 2003. The termination of Plaintiff was consistent with the habit or routine practice of Defendants. Plaintiff would show that CEO Paul Davies was terminated in May 2002, CEO John Rice was terminated in October 2002, and CEO ROBERT RANDALL ONSTEAD, JR. was terminated in April 2003.

## IV.

The Defendants in the case at bar breached the terms of the employment contract and terminated Plaintiff ROBERT RANDALL ONSTEAD, JR., without cause, and failed and refused, and continue to fail and refuse, to honor the termination provisions of the employment contract made the subject of this suit.

## V.

Plaintiff ROBERT RANDALL ONSTEAD, JR. sues for the $100,000.00 signing bonus, which was never paid, $475,000.00 termination payment, which was never paid, and attorneys' fees,

-2-

A027

which were brought about and made necessary as a result of the refusal of the Defendants to honor

its agreement.

## VI.

Additionally, Plaintiff ROBERT RANDALL ONSTEAD, JR. alleges that he was fraudulently

induced into the contractual arrangement above-referenced and that the Defendants never intended

to live up to its representations, but nevertheless represented the terms of the contract as above

referenced knowing full well that Plaintiff would rely upon those representations and rely upon them

to his detriment, all of which was, in fact, done. Plaintiff herein, therefore, sues, in addition to the

compensatory damages above set forth as well as attorneys' fees, for exemplary or punitive damages

as an example to others who might be tempted to defraud others.

## VII.

Plaintiff REBECCA NASH was extended an offer to join Defendants' Executive Committee

as Senior Vice-President - Marketing. The proffered salary to Plaintiff was $250,000.00 per year

together with a $25,000.00 signing bonus. The employment contract also called for a termination

provision equal to one year's salary.

## VIII.

Without cause and in breach of its contract with REBECCA NASH, Plaintiff was terminated.

## IX.

Defendants have failed and refused to honor its contract with Plaintiff REBECCA NASH, and

continue to fail and refuse to pay the termination benefits promised. As a result thereof, Plaintiff has

found it necessary to hire the undersigned attorney to represent her in her controversy with

Defendants.

<div align="center">-3-</div>

### X.

Plaintiff REBECCA NASH sues Defendants for the $250,000.00 termination benefits wrongfully withheld together with attorneys' fees and pre-judgment and post-judgment interest.

### XI.

Plaintiff DANIEL FERGUSON was extended an offer to join Defendants' Executive Committee as Senior Vice-President - Supply Chain. The extended offer included a salary of $250,000.00 per year, a relocation provision which included a real estate commission on the sale of his existing home, at the time the offer was accepted, in the amount of $50,000.00 to $60,000.00, and a termination provision equal to one year's salary.

### XII.

Without cause and in breach of its contract with DANIEL FERGUSON, Plaintiff was terminated.

### XIII.

Defendants have failed and refused to honor its contract with Plaintiff DANIEL FERGUSON, and continue to fail and refuse to pay the termination benefits and real estate commission as promised. As a result thereof, Plaintiff has found it necessary to hire the undersigned attorney to represent him in his controversy with Defendants.

### XIV.

Plaintiff DANIEL FERGUSON sues Defendants for the $250,000.00 termination benefits wrongfully withheld, the $50,000.00 to $60,000.00 real estate commission that was never paid, attorneys' fees and pre-judgment and post-judgment interest.

A029

## XV.

It is alleged that the Defendants and its officers conspired to deprive the Plaintiffs herein of their contractual rights and accordingly terminated them without cause.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon final trial or hearing of this case, that they have judgment against the Defendants for their actual damages in an amount far in excess of the minimum jurisdictional limits of this Court, exemplary damages, attorneys' fees, costs of Court, pre-judgment and post-judgment interest as allowed by law, and such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

THE KRIST LAW FIRM, P.C.

By: _____
RONALD D. KRIST
State Bar No. 11727000
One Corporate Plaza
2525 Bay Area Blvd., Suite 410

Houston, Texas 77058
Phone: (281)283-8500
Fax: (281)488-3489

ATTORNEYS FOR PLAINTIFFS

-5-

A030

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon Defendants' counsel via certified mail, return receipt requested, on this the 25 7/ day of September, 2003.

Edward L. Friedman
Locke Liddell & Sapp LLP
600 Travis Street, Suite 3400
Houston, Texas 77002

RONALD D. KRIST

-6-

A031

Exhibit K

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                          ) Chapter 11
                                )
GARDEN RIDGE CORPORATION,       ) Case No. 04-10324 (RB)
et al.,                         ) Jointly Administered
                                )
           Debtors.             )

         Deposition of DANIEL FERGUSON taken pursuant
to notice at the law offices of Young, Conaway,
Stargatt & Taylor, LLP, The Brandywine Building,
1000 West Street, Wilmington, Delaware, beginning at
2:06 p.m. on Thursday, October 27, 2005, before
Patricia L. Shelton, Registered Professional Reporter
and Notary Public.


APPEARANCES:

          JOSEPH M. BARRY, ESQ.
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            The Brandywine Building
            1000 West Street - 17th Floor
            Wilmington, Delaware  19801
            for the Reorganized Debtors and
            Debtors in Possession

          WILLIAM D. SULLIVAN, ESQ.
          BUCHANAN INGERSOLL, P.C.
            The Nemours Building
            1007 North Orange Street - Suite 1110
            Wilmington, Delaware  19801
            for Daniel Ferguson


               WILCOX & FETZER
      1330 King Street -  Wilmington, Delaware 19801
                 (302) 655-0477

                                        GR703



WILCOX & FETZER LTD.
Registered Professional Reporters



Daniel Ferguson

15

1  the payee?

2      A.    Garden Ridge, L.P.

3      Q.    And what is the principal amount of this note?

4      A.    250,000.

5      Q.    Is there an interest component to the note?

6      A.    Yes.

7      Q.    And what is that?

8      A.    2.7 percent per annum.

9      Q.    Is it fair to say that under the terms of this

10  note, you currently owe Garden Ridge, L.P. $250,000 plus

11  interest?

12          MR. SULLIVAN:  Objection to the extent it

13  calls for a legal conclusion.

14      Q.    You can answer.

15      A.    Yes.  I hesitate only because I'm not sure on the

16  interest piece of it.  But, yes.

17      Q.    Do you owe Garden Ridge Management, Inc. any

18  amounts under this note?

19          MR. SULLIVAN:  Objection to the form.

20      A.    I owe Garden Ridge 250,000.

21      Q.    My question is, do you owe Garden Ridge

22  Management, Inc. any amounts under this note?

23      A.    I don't know how to answer that.

24          If Garden Ridge, Inc. is part of Garden

Daniel Ferguson

16

1    Ridge, then I can only assume that... I'm confused.  I'm

2    sorry.

3        Q.    I understand.  Maybe I can -- let's back up.

4              You just testified that you owed Garden

5    Ridge, L.P. $250,000 plus interest under this note.

6        A.    Okay.

7        Q.    Is that an accurate characterization of your

8    testimony?

9              MR. SULLIVAN:  The record will speak for

10   itself.

11       A.    Yes.

12       Q.    That's an accurate representation -- or, that's

13   an accurate characterization of your testimony?

14       A.    I read to you who the maker -- no.  I'm sorry.

15   The payee was.  My understanding was I took this loan out

16   from Garden Ridge.

17       Q.    Even though it only specifically identifies

18   Garden Ridge, L.P. as the payee?

19       A.    Yes.  My understanding was still that it was

20   taken out -- Garden Ridge was giving me the loan.  I

21   wasn't -- I wasn't -- I don't want to say concerned.  I

22   never really paid any attention to the L.P., to be very

23   honest with you.  All I know is I went to Garden Ridge,

24   asked for the loan.  Garden Ridge, in the form of a CEO,

76

State of Delaware        )
                         )
New Castle County        )

### CERTIFICATE OF REPORTER

I, Patricia L. Shelton, Notary Public, do hereby certify that there came before me on the 27th day of October, 2005, the deponent herein, DANIEL FERGUSON, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

                    Patricia L. Shelton
                    Certification No. 104-RPR
                    (Expires January 31, 2008)

DATED:



WILCOX & FETZER LTD.
Registered Professional Reporters          GR779

## CERTIFICATE OF SERVICE

I, Joseph M. Barry, Esquire, hereby certify that I am not less than 18 years of age and that on November 17, 2006, I caused a copy of the attached document to be served on the following party by Hand Delivery:

William D. Sullivan, Esq.
William D. Sullivan, LLC
4 East 8th Street, Suite 400
Wilmington, DE 19801

Counsel for Daniel Ferguson

Joseph M. Barry (Delaware Bar No. 4221)

Dated: November 17, 2006